CHICOPEE CO-OPERATIVE BANK & others *vs.* BOARD OF
BANK INCORPORATION.

Suffolk.    February 4, 1964. — July 2, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK,
SPIEGEL, & REARDON, JJ.

*Bank and Banking.   Coöperative Bank.   Federal Savings and Loan Association.   Equity Jurisdiction,* Review of decision of board of bank incorporation.   *State Administrative Procedure Act.*

A review by this court under G. L. c. 170, § 49, of a decision by the Board
of Bank Incorporation in an adjudicatory proceeding on an application
by a coöperative bank for the board's approval of the applicant's conversion to a Federal savings and loan association under § 49 is governed by the standards of review set forth in c. 30A, § 14 (8).   [745]

Action by the Board of Bank Incorporation in form approving under
G. L. c. 170, § 49, a conversion of a small, "woefully inadequate" coöperative bank to a Federal savings and loan association, but in reality
impliedly approving a contemplated simultaneous merger, to which the
conversion was a necessary preliminary, of the converted bank with a
large Federal savings and loan association located in another county,
whereby the converted bank would be absorbed by the other association
and become a branch thereof, was beyond the statutory authority of the
board and must be set aside by this court on review under § 49; c. 30A,
§ 14.   [750–751, 754]

PETITION filed in the Supreme Judicial Court for the
county of Suffolk on May 31, 1963.

The case was reserved and reported by *Kirk,* J., without
decision.

*Lawrence A. Sullivan (Henry P. Monaghan* with him) for
Savings Banks Association of Massachusetts; *Timothy J.
Donovan* for Chicopee Co-operative Bank & others; *Frederick D. Bonner,* for Massachusetts Co-operative Bank
League, with them.

*David W. Hays,* Assistant Attorney General, for the
Board of Bank Incorporation.

*J. Joseph Maloney, Jr.,* for Chicopee Falls Co-operative
Bank.

KIRK, J.   This is a petition by three banks[1] (the petitioners) in the city of Chicopee for review under G. L. c. 170, § 49; c. 30A, § 14, of the decision of the respondent Board of Bank Incorporation[2] (the board), purportedly made under G. L. c. 170, § 49, relative to the application of the Chicopee Falls Co-operative Bank (the applicant bank) to convert to a Federal savings and loan association.   The Massachusetts Co-operative Bank League and the Savings Banks Association of Massachusetts have intervened in support of the petitioners under G. L. c. 30A, § 14 (2).   The applicant bank has intervened in support of the board.   The single justice before whom the case was brought granted a stay of the enforcement of the board's decision (G. L. c. 30A, § 14 [3]) and, at the request of all the parties, reported the case without decision to the full court upon the pleadings, the orders of the single justice, and the transcript of the proceedings before and exhibits submitted to the board.   G. L. c. 211, § 6.   No question has been raised as to the standing of any party to participate in the litigation. All parties in their respective briefs have expressly conceded that original jurisdiction rests in this court and that the standards of review provided in the administrative procedure act are applicable.   We note, nevertheless, in summary, that since the petitioners are persons aggrieved (see *Shaker Community, Inc.* v. *State Racing Commn.* 346 Mass. 213) by a final decision of the board, which is an agency of the Commonwealth (G. L. c. 30A, § 1 [2]; G. L. c. 26, § 5), required by G. L. c. 170, § 49, to conduct an adjudicatory proceeding (G. L. c. 30A, § 1 [1]), judicial review of which is not expressly precluded, but rather is expressly given to this court by G. L. c. 170, § 49, consideration of the case is to be governed by the standards of review set out in paragraph (8) of G. L. c. 30A, § 14.   Compare *Natick Trust Co.* v. *Board of Bank Incorporation,* 337 Mass. 615.

[1] The petitioners are the Chicopee Co-operative Bank, the Chicopee Savings Bank, and the Chicopee Falls Savings Bank.

[2] The Board of Bank Incorporation consists of the State Treasurer, the Commissioner of Banks, and the Commissioner of Corporations and Taxation. G. L. c. 26, § 5.

The decision of the board was not unanimous. The majority, consisting of the State Treasurer and the Commissioner of Corporations and Taxation, favored the applicant bank. The Commissioner of Banks filed a dissent. We summarize the facts as found by the majority of the board, and supplement them with admitted or undisputed facts from the record which serve to clarify the findings and delineate the issues raised before us.

The applicant bank is located in Chicopee Falls, one of the several villages or communities of the city of Chicopee. The population of the city is approximately 60,000. Although the applicant bank has been in existence for more than forty years, it is the smallest coöperative bank in the Commonwealth, having assets of only $413,000. At the time of the hearing it was open for business only three days a week from 9 A.M. to 1 P.M. and prior to that time open only one day a month and by appointment. The only "full-time" employee is the treasurer who is in semi-retirement and whose salary is so meager that it would not attract a successor should he retire completely, as he plans to do. The directors have been relatively inactive for a decade and have made no real effort to rehabilitate the bank or to merge it, as permitted by law (G. L. c. 170, § 48), with another coöperative bank in the area. On December 13, 1962, the applicant bank entered into a written agreement to merge with the Union Federal Savings and Loan Association (Union Federal) whose home office is in Pittsfield. By letter of December 21, 1962, the applicant bank gave notice of its intention, and applied to the board for approval, pursuant to the provisions of G. L. c. 170, § 49 (1), to convert to a Federal savings and loan association under the name of The Chicopee Falls Federal Savings and Loan Association with a place of business at 4 Broadway, Chicopee Falls. Following this application to convert, the Chicopee Co-operative Bank (one of the petitioners) offered to discuss merger with the applicant bank, but indicated that, if they merged, the Chicopee Co-operative Bank would not operate the applicant bank's place of business as a branch of its

own.   The merger of these two coöperative banks, even if effected, would result in a coöperative bank with only $3,000,000 in assets, in the closing of the applicant bank's office, and in diminished public service.   In compliance with G. L. c. 170, § 49 (1), notice of a public hearing was published on a form provided by the board giving, as stated above, the name [and location] of the applicant bank and its proposed name and location after conversion.   At the hearing, held and completed on February 28, 1963, there was no evidence that the public convenience and advantage would be promoted by the conversion, per se, that is, by the surrender of the State charter and the granting of a Federal charter.   All of the witnesses favoring the application for conversion testified that the whole purpose of the application was to accomplish the merger, to which the conversion was an indispensable preliminary step.   All of them were agreed that the public convenience and advantage which they foresaw could not be realized unless and until the merger took place.   The merger agreement expressly provided that the applicant bank "is hereby merged with and becomes a part of . . . [Union Federal] which shall be the resulting association . . . and . . . shall be deemed to be and shall be a continuation of the entity and identity of . . . [Union Federal whose] rights and obligations . . . shall remain unimpaired."   The agreement also provided that the office of the applicant bank at 4 Broadway, Chicopee Falls (Hampden County), should become a branch of Union Federal of Pittsfield (Berkshire County), which already had a branch bank in Springfield (Hampden County). Toward the close of the hearing the attorney for the applicant bank informed the board that, during a recess taken a few minutes before, he had learned, "that on this type of conversion, there will be no Federal charter issued to the Chicopee Falls Co-Operative Bank, but [there] will be an approval of conversion and merger simultaneously, so there never will be a Chicopee Falls Federal [Savings] & Loan Association charter issued, it will be done in one package: conversion and merger."

In its decision filed April 26, 1963, the board referred to the agreement of the applicant bank to merge with Union Federal, "subject to the approval of this Board of its conversion to a Federal charter and the approval of the Home Loan Bank Board of this issuance of such a charter and of the merger." The decision continued: "Union Federal has assets of almost $100,000,000, offers full banking services, and is possessed of efficient and aggressive management. *We find that if this merger became effective, public convenience and advantage would be promoted.* We find that those residents of the area who are now potential customers of the Chicopee Falls Co-operative Bank would be adequately served *after the merger* for the following reasons: (1) The character of the management of *the merged bank* would be far superior to that of the present management; (2) The banking facilities made available to the public would be far more extensive than those facilities which are presently being offered by the Chicopee Falls Co-operative Bank. The funds available for real estate borrowing would be more than adequate *after the merger* whereas at the present time they are woefully inadequate. *For the above reasons we find in favor of the applicant that public convenience and advantage will be promoted, and we approve such conversion"* (emphasis supplied).

The board concluded with the comment that its decision was not an invitation to other coöperative banks to apply for conversion but was an effort to find a practical solution for a "tiny, pitifully inadequate bank . . . in danger of closing its doors," and that each application thereafter would be decided on its merits.

The petitioners ask us to set aside the decision on the grounds that it (a) is beyond the statutory authority given to the board by G. L. c. 170, § 49; (b) is contrary to declared legislative policy; (c) is unsupported by substantial evidence; and (d) was reached in violation of the adjudicatory hearing requirements of G. L. c. 30A, § 11 (1). Any one of the stated grounds, if made out, would be sufficient to set aside the decision. We approach our consideration of the

case mindful of the admonition that the reviewing "court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it." G. L. c. 30A, § 14 (8). It is our duty, nevertheless, to ensure that the board exercise only those powers given to it and that it adequately consider and apply the legislative policies entrusted to it.

The authority of the board to deal with the subject matter is found in the relevant part of G. L. c. 170, § 49, which reads, "Any such [coöperative banking] corporation may convert itself into a federal savings and loan association . . . subject to the following conditions: — (1) Such corporation shall give notice to the board of bank incorporation of its intention to so convert and shall apply to said board for its approval of such conversion, and if the board determines that public convenience and advantage will be promoted by such conversion, the board shall grant such approval . . . ."

Although there is, perhaps inescapably, some overlapping of the approaches used by the petitioners to attack the board's decision, we address ourselves primarily to the question whether the decision is in excess of the board's statutory authority. The resolution of the question requires that we first consider what the board decided. In form, the board approved the conversion of the applicant bank and recited the statutory standard (that the public convenience and advantage would be promoted by the conversion) as the basis for its decision. In point of fact, however, using the same statutory form of words, the board approved the proposed *merger* of the applicant bank with Union Federal, whereby the corporate existence of the applicant bank would be extinguished and be replaced by a new branch of Union Federal. The board predicated its express approval of the conversion upon its implied approval of the agreed merger. Our decisions and the General Laws recognize the distinction between a conversion, on the one hand, and a merger or consolidation, on the

other.   In the case of conversion there is a continuing identity of a bank changed from a State chartered institution to a federally chartered one.   *Worcester County Natl. Bank* v. *Commissioner of Banks,* 340 Mass. 695, 700–704, and cases cited.   In the case of consolidation or merger,[3] however, the corporate existence of all but one of the consolidating or merging entities is discontinued and consolidated or merged with that of the remaining entity which continues. See G. L. c. 168, § 72; c. 170, § 48; c. 171, § 30; c. 172, § 38. It is clear that the agreement between the applicant bank and Union Federal contemplated the complete absorption of the former by the latter which would retain its identity. This is not conversion.

We think that the board's implicit approval of the agreement to merge, and the assignment of the agreement as the basis for its approval of the application to convert, exceeded the board's authority.   In the first place, there is in this Commonwealth no express statutory authority for the merger of coöperative banks with Federal savings and loan associations, either with or without the approval of a public agency.   Nor do we think that a case can be made out for implied authority of the board, directly or indirectly, to approve or permit such a merger.   A study of the Commonwealth's banking statutes demonstrates that the Legislature has been explicit when it intended to permit mergers. It has expressly authorized the merging or consolidation of savings banks (G. L. c. 168, § 72) ; the consolidation of coöperative banks (G. L. c. 170, § 48) ; the consolidation of credit unions (G. L. c. 171, § 30) ; the consolidation, merger or conversion of trust companies, banking companies or national banking associations (G. L. c. 172, § 38) ; and the consolidation or merger of banking companies and trust companies (G. L. c. 172A, § 12A).   Had the Legislature intended to permit the merger of coöperative banks with Federal savings and loan associations it would have indicated its intention in equally clear and explicit terms.   Au-

---

[3] For a discussion of merger in different contexts see *Major* v. *State St. Bank & Trust Co.* 346 Mass. 441.

thority to do so cannot be implied in the face of such a clearly defined legislative pattern.

The legislative history of G. L. c. 170, § 49, confirms our view that there is under it no implied authority in the board to approve a merger with a Federal savings and loan association or to approve a conversion as a means of effecting such a merger. This history, set out in some detail in the footnote,[4] shows, in general, a progressive tendency by the Legislature to regulate, with increasingly strong controls, the conversion of coöperative banks to Federal savings and loan associations, culminating in the enactment of St. 1956, c. 246, which required, for the first time, the approval of the board, whose prescribed criterion for approval was "that public convenience and advantage . . . be promoted by such conversion." The frequency and the sensitivity of the Legislature's concern over coöperative banks leaving the State system by conversions and the constancy of the direction of legislative action toward the discouragement of them lead us to conclude that, a fortiori, mergers, whether to be accomplished directly or indirectly, are not within the purview of the approving power delegated to the board by G. L. c. 170, § 49.

---

[4] A coöperative bank was allowed, for the first time, to convert to a Federal savings and loan association in 1935 when the Legislature added to G. L. c. 170 a new section (§ 50A) which permitted conversion if "authorized by a vote of at least three quarters of the shareholders of such corporation present and voting at a meeting especially called to consider the subject." St. 1935, c. 215. Three years later the Legislature made this provision more stringent by changing the requirement for approval of a conversion from "three quarters of the shareholders of such corporation present and voting" to "a majority of *all* the shareholders of such corporation, entitled to vote, voting in person or by proxy" (emphasis supplied). St. 1938, c. 162, § 2. By 1943 thirty coöperative banks had converted to Federal savings and loan associations. As a result, the Legislature made the requirement for conversion even more strict by changing the required vote from "a majority" to "two thirds." St. 1943, c. 235, § 1. Section 2 of the latter act went further and prohibited any coöperative bank from converting for a period of two years from the date of the act. Exercise of the conversion privilege was further deferred each year from 1945 to 1950. St. 1945, c. 193; St. 1946, c. 111; St. 1947, c. 20; St. 1948, c. 45; St. 1949, c. 269. In 1950 G. L. c. 170 was completely revised and coöperative banks were once again permitted to convert "if authorized by a vote of a majority of all the shareholders of such corporation, entitled to vote, voting in person or by proxy, at a meeting especially called to consider the subject." In the ensuing six years, six coöperative banks converted. The Legislature thereupon, by St. 1956, c. 246, imposed the additional requirement of the approval of the board.

We feel further strengthened in our holding by the fact that G. L. c. 26, § 5, which established the board, prescribes no general duties for it and grants no general powers to it. Whatever powers and duties the board has, and they are indeed many, are derived from various specific statutes. In several of these the standard for the exercise of the board's judgment is, as here, that the "public convenience and advantage will be promoted." Examples are: the establishment of new savings banks (G. L. c. 168, § 78), new coöperative banks (G. L. c. 170, § 3), and new trust companies (G. L. c. 172, §§ 7, 10); the permission to operate a banking company (G. L. c. 172A, § 2); and the conversion of a savings bank to a federally chartered savings bank (G. L. c. 168, § 73A). Other powers of the board to approve or withhold approval, not expressly governed by the statutory standard, are: permission to foreign banks to transact business (G. L. c. 167, § 37); permission to act as a bank holding company (G. L. c. 167A, §§ 2, 3, 4); change in location of main offices of savings banks (G. L. c. 168, § 4) or coöperative banks (G. L. c. 170, § 12); and establishment of branch offices of trust companies (G. L. c. 172, § 11). In light of these closely knit and precisely drawn statutes, dealing with the delicate subject of banking in its various forms, and with the board's powers in respect thereto, we find it difficult to read into G. L. c. 170, § 49, the delegation of power which the board has undertaken to exercise, and we decline to say that it has such power in the absence of a clearly stated legislative intent.

The rather extensive consideration which we have given to the banking statutes of the Commonwealth, and to the role of the board in their execution, especially in regard to the kind, number, location, concentration, and transformation of banking institutions, demonstrates that responsibility is confided to the board to promote, within its statutory powers, a sound banking system which will provide for the needs of the people and business, and, at the same time, will encourage reasonable competition and discourage monopolies. The standard for the exercise of its judgment, that "the public convenience and advantage will be promoted,"

is established as a guide to achieve that end. *Wall* v. *Fenner,* 76 S. D. 252, 258–259 (1956). See *Elizabeth Fed. Sav. & Loan Assn.* v. *Commissioner of Banking & Ins.* 30 N. J. 190, 194 (1959). This standard requires not merely that consideration be given to the convenience and advantage of a particular bank and its shareholders, or to the people in the immediate community who do business with it, but, as well, that full consideration be given to the effect of the decision upon the banking system as a whole and upon the public whose transcendent interest the board represents. See *Newton* v. *Department of Pub. Util.* 339 Mass. 535, 546–547; *New York Cent. R.R.* v. *Department of Pub. Util., ante,* 586, 592. The standard requires an affirmative showing by the applicant bank that the public interest will be better served by the change than without it, and that legislative policies, entrusted to the board for observance, are not ignored.

In this Commonwealth the Legislature has established and consistently maintained a policy against branch banking across county lines. This policy has been applied to savings banks (G. L. c. 168, §§ 5 and 72), coöperative banks (G. L. c. 170, § 12), trust companies (G. L. c. 172, § 11), and banking companies (G. L. c. 172A, § 12).[5] Merger is the primary method employed by banks to establish branches. 71 Yale L. J. 502, 515–516. The merger of coöperative banks and Federal savings and loan associations, which is not authorized by the Legislature, would contravene this legislative policy since the merged bank could operate as a branch of the resulting association even though the latter is located in a different county.[6] This result follows from

---

[5] In the Final Report of the Special Recess Commission on Branch Banking (1960 House Doc. No. 2676, p. 12), the Commission recommended that "any trust company, savings bank or co-operative bank [be permitted] to establish, in any county adjoining the county in which its main office is located, not more than three branch offices . . . to be located . . . not more than fifteen miles from . . . [its] main office." This recommendation was not accepted by the Legislature (p. 15).

[6] Although the Legislature under the provisions of G. L. c. 172, § 38, has expressly authorized the merging of national banking associations with State chartered trust companies, this does not contravene the policy against branch banking across county lines because, under Federal law, national banking asso-

the Federal regulation allowing Federal savings and loan associations to establish branch offices,[7] and the decision of this court to the effect that the statutory policy of this Commonwealth against branch banking across county lines has no application to Federal savings and loan associations. *Springfield Inst. for Sav.* v. *Worcester Fed. Sav. & Loan Assn.* 329 Mass. 184. See also *North Arlington Natl. Bank* v. *Kearny Fed. Sav. & Loan Assn.* 187 F. 2d 564 (3d Cir.); *Bridgeport Fed. Sav. & Loan Assn.* v. *Federal Home Loan Bank Bd.* 307 F. 2d 580, 581 (3d Cir.).

Since the board's approval of the application to convert is in fact an approval to merge, it is in excess of the board's authority and must be set aside. The board's power to approve a true conversion is not curtailed by our decision. To be sure, there is always the possibility that a converted bank, once in the Federal system, may merge with other Federal banks. That possibility in itself is not a sufficient reason to withhold approval of an application for conversion, if the standard is otherwise met, although it is a factor to be weighed with other relevant factors in considering a particular application. In the instant case, the candidly declared purpose of the conversion is not merely to withdraw from the State system, but to become forthwith a branch of Union Federal and thus to participate in a plan the effect of which is the circumvention of the laws which this Commonwealth has imposed upon the banks of its own creation in the same competitive field. It is the board's duty to disapprove the application. Other contentions of the petitioners need not be discussed.

A decree is to be entered setting aside the decision of the board.

*So ordered.*

---

ciations may establish branches within a State only to the extent that State chartered banks are permitted to establish branches. 12 U. S. C. (Supp. IV, 1959–1962) § 36 (1958), 13 Stat. 484, as amended through 76 Stat. 667.

[7] "No Federal association may establish or maintain a branch office without the prior written approval of the Board." 12 C. F. R. (1962) § 545.14. There is contained in this regulation no provision prohibiting a Federal savings and loan association from branching in areas where State banks are forbidden by State law to branch.