## NORTH ARLINGTON NAT. BANK v. KEARNY FEDERAL SAVINGS & LOAN ASS'N.

### No. 10335.

United States Court of Appeals Third Circuit.

Argued Jan. 15, 1951.

Decided Feb. 28, 1951.

Fred Herrigel, Jr., Newark, N. J., (Herrigel, Bolan & Vieser, Newark, N. J., Irvine B. Johnstone, Jr., Westfield, N. J., on the brief), for plaintiff-appellant.

Leslie S. Kohn, Newark, N. J. (Koch, Gillespie & Masini, Newark, N. J., Frank G. Masini, Newark, N. J., on the brief), for defendant-appellee.

Newell A. Clapp, Acting Asst. Atty. Gen., Edward H. Hickey, Donald B. Mac Guineas, Department of Justice, Washington, D. C., Kenneth G. Heisler, Mose Silverman, Washington, D. C., on the brief for the United States as amicus curiae.

Before GOODRICH, KALODNER and STALEY, Circuit Judges.

GOODRICH, Circuit Judge.

This case involves the question whether a Federal savings and loan association may have a branch office. The suit is for a declaratory judgment originally brought in a state court in New Jersey and removed to federal court. The plaintiff is a national bank doing a general banking business in North Arlington, N. J. The defendant, whose home office is in Kearny, N. J., a town adjoining North Arlington, has established and is operating a branch office in North Arlington. The branch office is about one half mile from the home office of the defendant and was established with the approval of the Federal Home Loan Bank Board.[1] Plaintiff complains of this operation and asks that it be declared illegal. The case was dismissed by the District Court.

The Savings and Loan Association raises several defenses to plaintiff's suit. It says the plaintiff has no standing to complain of the alleged illegality of this branch office. It says that plaintiff has not exhausted its administrative remedies and that it has failed to join indispensable parties defendant. Finally, and this is obviously the most important substantive law question, defendant says that the branch office is lawfully maintained.

1. Defendant applied to the Board for authority in September 1948. It was granted on February 28, 1949, after notice and hearing. On May 31, 1949, the present action was instituted.

We incline to the view that plaintiff has standing to question the legality of what the defendant has done. We shall not go into the cases cited by each side for our decision does not turn upon this point. But it seems to us that if the defendant's maintenance of this branch is unlawful it is indulging in unfair competition with the plaintiff and the harm caused by the competition, if not justified by the lawfulness of that competition, gives the plaintiff a standing to complain. See Restatement, Torts § 710 (1938). We assume the point, however, and do not decide it. Granted arguendo, plaintiff has standing to raise the question of the legality of the defendant's conduct our view is that the establishment of the branch office in this case was lawful. Since it was lawful any injury which the plaintiff suffers by reason of any competition between it and the defendant is not the subject-matter of a suit for damages or relief in equity. Cf. Restatement, Torts § 708 (1938). It remains to point out why we think this is true.

(a) The Statute. The basic statute is the Home Owners' Loan Act of 1933, 12 U.S.C.A. §§ 1461–1468. Provision for Federal savings and loan associations begins with Section 1464. The statute is one of the type which states a policy, provides for the project under consideration, lays down some general rules and prohibitions and leaves details to the Board which is authorized by Section 1463. The statutory delegation of authority to the Board has been held constitutional.[2]

The statute does not give explicit authority to the Board to permit branch offices for associations set up under its guidance. There are words and phrases in the statute on which each side, respectively, relies to show that such authority was intended or, contra, not intended to be given. As evidencing the existence of authority for branch offices is Section 1464(c). This Section limits the selection of the security on which loans can be made to property within fifty miles of an association's home

office. It is argued, with plausibility, that it would be meaningless to speak of a "home" office if that was the only kind of office the association could have.

On the other side, the plaintiff points out that at the very opening of the Section authorizing these associations the policy is stated to provide "local mutual thrift institutions" and that later appears the clause "local home financing in the community to be served and for the reasonable financing of homes in such community." 12 U.S.C.A. § 1464(a) and (g). These raise an inference against the authorization of branch offices.

We think this latter argument is pretty well neutralized by the provision in section 1464(c), already referred to, about security. The associations are to lend their funds, with certain exceptions, either on their own shares or "on the security of first liens upon homes or combination of homes and business property within fifty miles of their home office." It seems to us that this shows the legislative concept of "local" and "community" better than reference to the dictionary, for the purpose of this case. But it may be granted that a microscopic examination of the statutory words alone does not bring one to any conclusion not open to reasonable differences of opinion.

Strong argument for the existence of the power on the part of the Board to establish a branch office for an association we think comes from other words of the statute. The Board is authorized in Section 1464(a) to issue charters for Federal savings and loan associations "giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States." Here is an area where the Board is given the duty and authority to make policy. It is supposed to find out what the practices of these institutions are and give primary consideration to the best ones.

What is the practice with regard to branch offices? According to a committee report[3] on a bill to amend the present

2. Fahey, Federal Home Loan Bank Comm'r. v. Mallonee, 1947, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030.

3. Report of Committee on Banking and Currency, Sen.Rep.No.1118, 81st Cong., 1st Sess. 2 (1949).

act, only six states have statutes which prohibit the establishment of branch offices by building and loan associations.[4] Thirteen states specifically authorize them and twenty-nine have not legislated upon the subject. Congress put the duty upon the Board to decide what was the best practice and to give consideration to it. The Board did so by authorizing branches under conditions set out in its Regulations. This, it seems to us, is a very strong argument for concluding that the authority to establish branch offices is vested in the Board, and by the very terms of the Congressional enactment.

**(b) Administrative Regulations and Congressional Action.** Since October, 1934, there has been included in the Rules and Regulations for the Federal savings and loan system a provision for the granting of permission for the operation of branch offices.[5] According to affidavit (of record in the case) of the Board's secretary, as of August 19, 1949, there were 1,498 Federal savings and loan associations, 59 of which are now operating 73 branches in 22 states and the District of Columbia. An administrative body cannot by its interpretation of the statute under which it operates increase its power beyond that given by the legislative body. But a contemporaneous interpretation by the authorized administrative agency is of weight in determining what the powers are. This has been held many times and we make no attempt to exhaust the authorities on the point.[6]

The weight to be given to the agency's interpretation of its authority here is emphasized by the subsequent legislative history. In the 81st Congress a House Bill and a Senate Bill (H.R. 4710 and S. 2006) provided for limitations upon the power of the Board with respect to the establishment of branch offices. Neither bill passed. But it would have been wholly unnecessary to provide for limitations on the power of the Board to provide for branch offices if it had no such power at all. In its Report on S. 2006 the Committee on Banking and Currency used the following language: "The bill * * * would amend subsection (d) of section 5 of the Home Owners' Loan Act of 1933 in such a way as to place the same restrictions upon the establishment and operation of branches by Federal savings and loan associations as are now prescribed by statute for the establishment and operation of branches by national banking associa-

---

4. New Jersey is listed as one of the six. Since 1946 state building and loan associations in New Jersey may not establish branches except by acquisition of or merger with an existing association. N. J.L. 1946, c. 56, p. 139, § 21, 17 N.J.S.A. 12A-21 (1950).

5. This was shown by affidavit of record from J. Francis Moore, Secretary of the Home Loan Bank Board. The present regulation has been unchanged since at least 1938. See 24 Code Fed.Regs. § 203.16(b) (1938), redesignated by Resolution 1286, 13 Fed.Reg. 8273 (1948) as 24 Code Fed.Regs. § 143.16(b) (1949 ed.). It reads as follows: (b) *Branch office.* A branch office of a Federal association is a legally established place of business of the association authorized by the board of directors, at which subscriptions for share accounts and applications for loans may be received, and at which share account books and certificates of membership may be issued and loans, when properly approved by the board of directors,

may be closed. Branch offices may receive share account and loan payments and shall keep detailed records of all transactions at such branch offices and shall furnish such control records to the home office as may be necessary for the proper conduct of the business. No Federal association may establish or maintain a branch office without the prior written approval of the Board. Each application for such approval shall state the need therefor, the functions to be performed therein, the estimated annual expense thereof and shall be accompanied by a proposed annual budget of the association.

6. See, e.g., United States v. American Trucking Associations, 1940, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Federal Trade Commission v. Bunte Brothers, Inc., 312 U.S. 349, 352, 61 S. Ct. 580, 85 L.Ed. 881; Norwegian Nitrogen Products Co. v. United States, 1933, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 793.

tions."[7] We think that the bills and the report thus impliedly averting to the existence of the power is stronger argument for its existence than the mere failure of Congress to do anything about an administrative body's interpretation of its authority when the matter is not directly called to its attention.

(c) Policy. Finally, there is a consideration of a point on principle which may not be amiss in this highly technical business of statutory interpretation. We were pressed with the decisions under the National Banking Act to the effect that national banks could not under the original law have branches[8] and that the privilege given to them to establish branches has been very strictly limited. All that is tied up with the historical reasons back of the establishment of national banks and the altogether different type of administrative control exerted over them. We do not think that the analogy drawn to the limitations of the powers of the national banks is very helpful in our questions here.

These savings and loan associations do some of the same things which banks do, obviously. But they do not do a general banking business. They are set up under the declared Congressional purpose to provide thrift institutions in which people may invest their funds and to provide for the financing of homes. There is no danger of any single association becoming a giant monopoly. Its investment area is limited. The associations themselves can only be set up when, in the judgment of the Board, those applying for the charter are persons of good character and responsibility and there is a need for the institution in the community and a probability of its success. The Board is likewise limited in the granting of the charter to situations where the new association can be established without undue injury to properly conducted local thrift institutions already there.[9] Business with this type of institution is done, so far as payments to it are concerned, in small amounts and at frequent intervals. A man gets one loan on his home. That has to be passed upon by the directors at a meeting in the main office no doubt. But the payments on his loan or his subscription to shares will be a matter where convenience in the location of the association's office is of some concern to the customer. It may well be that it is good practice, instead of chartering a large number of associations too small to carry on successfully, to let an established concern do business through branches for the convenience of its customers. If, under all the restrictions placed upon the Board by the statute, it seems to those charged with the decision that a branch office of an established association should be permitted, we think it would be unfortunate to construe the statute to prevent that exercise of business judgment. Such a construction would tend to defeat the policy declared in the legislation.

In view of our opinion on the merits of the case we do not find it necessary to pass on defendant's contentions that North Arlington has failed to join an indispensable or necessary party and to exhaust its administrative remedies.

The judgment of the District Court will be affirmed.

7. Sen.Rep.No.1118, 81st Cong., 1st Sess. 1 (1949).

8. First National Bank in St. Louis v. Missouri, 1924, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486.

9. 12 U.S.C.A. § 1464(c).