LYONS SAVINGS & LOAN ASSO-
CIATION, Plaintiff,

v.

FEDERAL HOME LOAN BANK
BOARD et al., Defendants.

GLENVIEW GUARANTY SAVINGS AND
LOAN ASSOCIATION, an Illinois sav-
ings and loan association, et al., Plain-
tiffs,

v.

Thomas R. BOMAR et al., Defendants.

SKOKIE FEDERAL SAVINGS AND
LOAN ASSOCIATION, Plaintiff,

v.

FEDERAL HOME LOAN BANK BOARD
and Talman Federal Savings and Loan
Association of Chicago, Defendants.

WINNETKA SAVINGS AND LOAN AS-
SOCIATION, an Illinois savings and
loan association, et al., Plaintiffs,

v.

HOME FEDERAL SAVINGS AND LOAN
ASSOCIATION OF CHICAGO, a Fed-
eral savings and loan association, et al.,
Defendants.

AMERICAN HERITAGE SAVINGS AND
LOAN ASSOCIATION, an Illinois Sav-
ings and Loan Association, Plaintiff,

v.

AUSTIN FEDERAL SAVINGS AND
LOAN ASSOCIATION OF CHICAGO,
a Federal Savings and Loan Associa-
tion, et al., Defendants.

HINSDALE FEDERAL SAVINGS &
LOAN ASSOCIATION, an Association
organized under the laws of the State
of Illinois, 1st Savings of Downers
Grove, an Association organized under
the Laws of the State of Illinois, and
Ben Franklin Savings and Loan Asso-
ciation, an Association organized under
the Laws of the State of Illinois, Plain-
tiffs,

v.

MID AMERICA FEDERAL SAVINGS &
LOAN ASSOCIATION, a Federal Sav-
ings and Loan Association, et al., De-
fendants.

FIRST CALUMET CITY SAVINGS, an
Illinois Savings & Loan Institution,
et al., Plaintiffs,

v.

FINANCIAL FEDERAL SAVINGS &
LOAN ASSOCIATION, a Federal Sav-
ings & Loan Association, et al., De-
fendants.

FIRST CALUMET CITY SAVINGS, an
Illinois Savings & Loan Association,
et al., Plaintiffs,

v.

CALUMET FEDERAL SAVINGS &
LOAN ASSOCIATION, a Federal Sav-
ings & Loan Association, et al.,
Defendants.

Nos. 73 C 2565, 73 C 2595, 73 C 2677,
73 C 2820, 73 C 3170, 73 C 3175,
73 C 3196 and 73 C 3197.

United States District Court,
N. D. Illinois, E. D.

March 27, 1974.

Sav. and Loan Assn, Hinsdale, Federal Sav. and Loan Assn, First Savings of Downers Grove, Ben Franklin Sav. and Loan Assn, First Calumet City Savings, First Sav. and Loan Assn of South Holland, Dolton-Riverdale Sav. and Loan Assn, First Sav. and Loan Assn of Hegewisch.

James S. Wirt, and A. Bradley Eben, Meyers & Matthias, Chicago, Ill., for plaintiffs Glenview Guaranty Sav. and Loan Assn, Niles Sav. and Loan Assn, The First Nat. Bank of Skokie, Old Orchard Bank and Trust Co.

Thomas H. Morsch, and Tomas M. Russell, Sidley & Austin, Chicago, Ill., for plaintiff Skokie Federal Sav. and Loan Assn.

Phillip E. Couri, Whitman, Kauffmann & Couri, Winnetka, Ill., for plaintiffs Winnetka Sav. and Loan Assn, Glenview Guaranty Sav. and Loan Assn.

Stuart B. Bradley, Bradley, Eaton, Jackman & McGovern, Chicago, Ill., for plaintiff Deerfield Sav. and Loan Assn.

David A. Bridewell, Russell, Bridewell & Lapperre, Chicago, Ill., for plaintiff The Winnetka Bank.

Francis J. McConnell, McConnell & Campbell, Chicago, Ill., for plaintiff First Nat. Bank of Winnetka.

Daniel J. Goldberg, Associate Gen. Counsel, Harvey Simon, Roland L. Marcotte, Jr., Federal Home Loan Bank Bd., Washington, D. C., for defendants Federal Home Loan Bank Board, Thomas R. Bomar, and Grady Perry, Jr.

Richard M. Calkins, Burditt & Calkins, Chicago, Ill., Donald E. Tolva, and Thomas B. Cassidy, Martin, Craig, Chester & Sonnenschein, Chicago, Ill., for defendant LaGrange Federal Sav. and Loan Assn.

Richard J. Troy, Geocaris, Sneider & Troy, Chicago, Ill., for defendant Brookfield Federal Sav. and Loan Assn.

Roger C. Wiegand, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Irwin I. Zatz, Arvey, Hodes, Costello & Burman, Chicago, Ill., for defendant Talman Federal Sav. and Loan Assn.

Roy C. Palmer, and John J. Muldoon, Palmer, McHugh, Muldoon & Blackman, Ltd., Chicago, Ill., for plaintiffs Lyons Sav. and Loan Assn, American Heritage

Leon E. Lindenbaum, Walsh, Case & Coale, Chicago, Ill., for defendant Home Federal Sav. and Loan Assn.

Emmett J. Galvin, Flynn, Galvin & Ryan, Chicago, Ill., for defendant Austin Federal Sav. and Loan Assn.

Fredric G. Novy, Garvey & Novy, Chicago, Ill., for defendant Mid America Federal Sav. and Loan Assn.

Paul R. Hoffman, Mortimer Hoffman, Chicago, Ill., for defendant Calumet Federal Sav. and Loan Assn.

Frank W. Gasior, Olympia Fields, Ill., Sherlock J. Hartnett, Chicago, Ill., for defendant Financial Federal Sav. and Loan Assn.

Philip B. Kurland, and M. I. Mishkin, Chicago, Ill., for amici curiae Illinois Bankers Assn, Independent Bankers Assn of America.

## MEMORANDUM OPINION

WILL, District Judge.

Plaintiffs in all eight of these actions are financial institutions located in Illinois. The complaints seek declaratory and injunctive relief from decisions made by the Federal Home Loan Bank Board (Board), a defendant in each of the suits, approving applications from various federally chartered savings and loan associations in Illinois to establish branch offices. The jurisdiction of the court is invoked pursuant to 28 U.S.C. § 1331(a) and 1337, and 28 U.S.C. §§ 2201 and 2202.

In addition to the Board and two individual members, Thomas R. Bomar and Grady Perry, Jr., various federal savings and loan associations whose branching applications have been approved are also named as defendants. All defendants have moved to dismiss either part or all of the respective complaints for failure to state a claim upon which relief can be granted. In accordance with Rule 12(b)(6), Fed.R.Civ.P., these motions are being treated as motions for summary judgment. For the reasons set forth below, they will be granted in part and denied in part.

I

The Federal Home Loan Bank Board is the agency charged with the regulation and supervision of all federal savings and loan associations in the United States. The Board is responsible for chartering any new federal association, as well as authorizing any of a broad range of activities in which existing federal associations may engage. Until January 12, 1973, the Board had never authorized *de novo* branches for federal associations in Illinois. On that date, the Board reversed its prior policy and voted to allow federal associations to apply for branching permits. The stated basis for its decision was, in part, a staff study which revealed "a multiplication of state approved savings and loan banking facilities, and the existence of substantial affiliate banking operations in Illinois." (Exhibit 2, Board's Memorandum). This circumstance, in the Board's view, put federal associations at a severe competitive disadvantage. Consequently, as of January 31, 1973, it began to accept, process and approve branch applications from federal savings and loan associations in Illinois. The instant suits all involve challenges to the Board's actions in approving certain applications.

Lyons Savings and Loan Association v. Federal Home Loan Bank and La-Grange Federal Savings and Loan Association and Brookfield Federal Savings and Loan Association, No. 73 C 2565 (the *Lyons* case), is brought by a state savings and loan association against the Board and two federal savings and loan associations, LaGrange and Brookfield, whose applications for branch offices in Countryside, Illinois, were approved by the Board on August 15, 1973, in Resolutions No. 73–1122 and No. 73–1123. Glenview Guaranty Savings and Loan Association, et al. v. Thomas Bomar, et al., 73 C 2595 (the *Glenview* case), involves a challenge by two state savings and loan associations, a state bank and a federal bank, to the approval of the application of Talman Federal Savings and

Loan Association, for the establishment of a branch in Skokie, Illinois. (Board Resolution No. 73–1471, October 15, 1973). Skokie Federal Savings and Loan Association v. Federal Home Loan Bank Board, et al., No. 73 C 2677 (the *Skokie Federal* case), is brought by a federal savings and loan association and also challenges the Board's approval of the Talman branch. And, Winnetka Savings and Loan Association, et al. v. Home Federal Savings and Loan Association No. 73 C 2820 (the *Winnetka* case), involves a challenge by three state savings and loan associations, a state bank and a federal bank against the Board's approval of the application of Home Federal for a branch office in Winnetka, Illinois. (Board Resolution No. 73–1123, October 5, 1973).

American Heritage Savings and Loan Association v. Austin Federal Savings and Loan Association of Chicago, et al., No. 73 C 3170 (the *American Heritage* case), is brought by a state savings and loan association against the Board and Austin, a federal association, challenging the Board's approval of a branch office and redesignation of that office as a "home office." (Resolution No. 73–956, July 20, 1973). First Calumet City Savings, et al. v. Calumet Federal Savings & Loan Association, et al., No. 73 C 3197 (the *Calumet Federal* case), is the action by four state associations against the Board and Calumet, a federal association, challenging the approval of a Calumet branch in Dolton, Illinois. (Resolution No. 73–1554, October 17, 1973). Hinsdale Federal Savings & Loan Association, et al. v. Mid-America Federal Savings & Loan Association, et al., No. 73 C 3175 (the *Hinsdale* case) is brought by two state associations and one federal association against the Board and another federal association, Mid-America, for the approval of a

branch in Clarendon Hills, Illinois. (Resolution No. 73–1679, November 14, 1973). And in First Calumet City Savings, et al. v. Financial Federal Savings & Loan Association, et al., No. 73 C 3196 (the *Financial Federal* case), three state associations are challenging the Board's approval of a branch office for Financial Federal in Calumet City, Illinois (Resolution No. 73–1620, October 29, 1973).

While there are some differences among the complaints, many of the issues raised by each are identical and will be treated together wherever possible. In brief, the complaints challenge: (1) the Board's authority to approve branch applications of federal savings and loan associations in any case; (2) the Board's statutory authority to allow *de novo* branching of federal associations in the face of state law which prohibits *de novo* branching of state savings and loan associations; (3) the constitutionality of allowing greater branching powers to federal associations than is allowed to either state associations or to banks; (4) the Board's compliance with its own regulation governing the effect of state law on the issue of branching; (5) the validity of the procedures followed by the Board in processing branch applications; and (6) whether the Board's action in approving the specific branch application involved in each of these eight cases was arbitrary and capricious.[1]

■ Defendants seek a preliminary ruling in their favor on all of these contentions except the last one, which involves the propriety of the Board's action in each particular case. That will depend on an examination of the record in each case and is clearly not amenable to decision at this state of the proceedings.[2]

---

1. The *Skokie Federal* and *Hinsdale* complaints raise only the issues involved in numbers (5) and (6); they do not challenge the authority of the Board with regard to branching generally or in Illinois.

2. Defendant Talman has moved to dismiss the entire complaint in both the *Glenview Guaranty* and *Skokie Federal* cases, arguing that the allegations of arbitrary and capricious action are without any basis in fact

However, all the other issues in these cases are appropriate for disposition at this point since we find that the law clearly supports the legality of the Board's action in allowing federal savings and loan associations to establish branch offices in Illinois. Because of the weight of authority in support of the Board's actions, most of the various plaintiffs' contentions can be disposed of summarily.

## II

■ The broadest contention of the plaintiffs in the instant cases is that the Board has no power to authorize branch offices for federal associations under any circumstances. While it is true that no explicit authority to approve branches appears in the Home Owners' Loan Act of 1933, 12 U.S.C. § 1461 et seq., (the "HOLA," or, "the Act"), every court which has considered this issue has construed the Act as including such a power.[3]

The source of the branching authority is found in Section 5(a) of the Act, 12 U.S.C. § 1464(a), which gives the Board as the chartering agency, plenary powers over the "organization, incorporation, examination, operation, and regulation" of all federal associations.[4] Both the comprehensive nature of the authority conferred by the Act, and an analysis of its wording,[5] compel the conclusion that the authority to approve branch applications is necessarily included among the Board's statutory powers. There is no basis for a contrary conclusion in the Act itself, its legislative history, judicial precedent or logic. Consequently, all aspects of the complaints which attack this aspect of the Board's authority will be dismissed.

## III

The next issue deals with the Board's branching authority over federal associations where state laws prohibit or limit branching of state associations. Plaintiffs contend that, whatever general authority the Board may have to approve branches, it may not authorize *de novo* branching in a state which prohib-

and are merely attempts to confer jurisdiction on the court. Talman concedes, however, that these allegations do state a proper claim for relief, and we deny its motion to dismiss those portions of the complaints.

3. See *Bridgeport Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 307 F.2d 580 (3rd Cir. 1962), cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963); *Springfield Institution for Savings v. Worcester Federal Savings & Loan Ass'n*, 329 Mass. 184, 107 N.E.2d 315 (1952), cert. denied, 344 U.S. 884, 73 S.Ct. 184, 97 L.Ed. 684; *North Arlington National Bank v. Kearny Federal Savings & Loan Ass'n*, 187 F.2d 564 (3rd Cir. 1951), cert. denied, 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617; *United States v. First Federal Savings & Loan Ass'n*, 151 F.Supp. 690 (E.D.Wis.1957), modified on other grounds, 248 F.2d 804 (7th Cir. 1957); *Central Savings & Loan Ass'n of Chariton, Iowa v. Federal Home Loan Bank Board*, 293 F.Supp. 617 (S.D. Iowa 1968), aff'd 422 F.2d 504 (8th Cir. 1970); *First National Bank of McKeesport v. First Federal Savings & Loan Ass'n of Homestead*, 96 U.S.App.D.C. 194, 225 F.2d 33 (1955).

4. Section 5(a) provides, in relevant part:
 In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the Board is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation of . . . Federal Savings and Loan Associations . . . and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.

5. Prior courts have concluded that the language of the Act which directs the Board to give primary consideration to the "best practices of local mutual thrift and home-financing institutions in the United States" contemplates a nationally uniform set of policies for federal associations and therefore allows the Board to decide that branching is a "best practice" which it may authorize for all federal associations. See *e. g. North Arlington, supra,* 187 F.2d at 565–566. And, courts have found significance in the use of the term "home office" in various sections of the Act, which would necessarily contemplate the existence of branch offices. See *e. g., North Arlington, supra* at 565.

its *de novo* branching of state chartered savings and loan associations.

Certain plaintiffs argue that a limitation on the Board's power is found within the statute itself. However, they are unable to point to any such limitation and we are unable to find one. The only statutory reference these plaintiffs make is to the language in § 1464(e) which states that "No charter shall be granted . . . unless the same can be established without undue injury to properly conducted existing local thrift and home-financing institutions." They then argue that allowing greater branching powers to federal associations gives those institutions an undue competitive advantage which, *per se,* unduly injures state institutions. However, the "undue injury" requirement in the HOLA is clearly directed to an analysis of a particular application in the context of its proposed service area and the local institutions already serving that area. Adopting plaintiff's interpretation could lead to harsh and absurd results—under-cutting the very basis of the Act.

The primary purpose for the enactment of the HOLA was to provide savings and loan services for areas not being served, or being served inadequately, by state institutions. Obviously, allowing a federal association to establish a branch office in an area not currently being served by *any* institution cannot cause "undue injury" to existing local institutions. The requirement is simply an appropriate safeguard against the establishment of federal associations in areas where they are not necessary.

█ Furthermore, this issue has been thoroughly considered by numerous courts, all of which have held that the Board is *not* limited by state law nor subject to state regulation. See *e. g.* North Arlington National Bank v. Kear-ny Federal Savings & Loan Ass'n, *supra;* Springfield Institution for Savings v. Worcester Federal Savings & Loan Ass'n, *supra;* and Central Savings & Loan Ass'n of Chariton, Iowa v. Federal Home Loan Bank Board, *supra.* Plaintiffs are unable to assert any judicial support for their position and are forced to argue that all of the prior cases were wrongly decided. Our review of those decisions, the rationales of which are summarized below, reveals no basis for finding they were wrongly decided.

First, courts have upheld the authority of the Board on the basis that the plenary powers given to the Board in the HOLA clearly evidence a Congressional intention to preempt the field, thus precluding any regulation of federal associations by state law. See *e. g.,* Washington Federal Sav. & L. Ass'n v. Balaban, 281 So.2d 15, 17 (Fla.S.Ct. 1973), and People v. Coast Federal Savings & Loan Association, 98 F.Supp. 311, 316 (S.D.Cal.1951).

Second, they have noted the absence of any provision in the HOLA comparable to that found in Section 36(c) of the National Bank Act, 12 U.S.C. § 36(c), which expressly limits branching of federal banks to the extent allowed state banks by state law.[6] Not only is there no comparable provision in the HOLA, but proposals to amend the Act to include a similar restriction have failed—notwithstanding Congressional awareness of both the Board's broad interpretation of its powers, and judicial sanctioning of that interpretation.[7]

Further, unlike the National Bank Act which ties branching policies of national banks directly into each state's laws, the HOLA directs the Board to give "primary consideration to the best practices of local mutual thrift and home-financing institutions *in the United States.*"

---

6. Certain plaintiffs here argue that § 36(c) is applicable to the Federal Home Loan Bank Board as well as to the Comptroller of the Currency. Prior courts have uniformly held that it is not. See *e. g., North Arlington, supra; Springfield Institution for Savings, supra.*

7. See the chronology of the legislative history of the various proposals noted in United States v. First Federal Sav. & L. Ass'n, 151 F.Supp. 690, 698 n. 5 (E.D.Wis.1961).

12 U.S.C. § 1464(a) (emphasis supplied). As mentioned above, the courts have construed this language as vesting discretion in the Board to determine first, what the "best practices" are, and second, to implement them on a nationally uniform basis. The fact that any particular state has not adopted for its own institutions what the Board deems to be a "best practice" cannot limit the Board's authority without undermining this fundamental purpose of the statute.

In sum, there is nothing in the HOLA itself which can even arguably be construed as limiting the Board's authority to approve branch offices for federal associations in any given state to the extent that local associations in that state are allowed to branch.

## IV

The Board, however, has issued a regulation limiting its authority in this area. It provides, in relevant part:

(b) *Policy on approval of branch office and mobile facilities.*

(1) As a general policy, the Board permits branches and mobile facilities by Federal savings and loan associations in a particular State if the State law, or State practice in absence of statutory prohibition, permits savings and loan associations, savings banks, or commercial banks of the State to establish branches in such State or to conduct chain, group or affiliate operations. However, the Board will make exceptions to this policy in cases where (i) an office acquired as a result of a merger instituted for supervisory reasons would be maintained as a branch office or (ii) a proposed branch office would be located in and serve, based on the criteria set forth in subparagraph (4) of this paragraph, a low-income, inner-city area which is inadequately served by existing savings and loan facilities. 12 C. F.R. 556.5(b)(1)

Plaintiffs' next contention is that the Board's decision to allow *de novo* branching of federal associations in Illinois violates that regulation.

The plaintiffs who raise this issue argue that its effect is to tie branching policies of federal associations directly to state law in the same way that Section 36(c) of the National Bank Act does for national banks. Obviously, however, the terms of this regulation differ markedly from § 36(c) in a critical respect. Regulation 556.5(b)(1) allows the Board to authorize *de novo* branching of federal savings and loan associations once the Board determines that any one of the following criteria are met: that state savings and loan associations *or* savings banks *or* commercial banks of that state can "branch"; *or* if any of these financial institutions conduct chain, group or affiliate operations. Thus, in contrast to § 36(c), no exact parity between state and federal savings and loan associations is either required or necessarily intended.

Congress was fully aware of this difference between § 36(c) and the Board's policy, as expressed in Reg. 556(b)(1), during the several debates on whether or not legislation limiting the Board's branching authority should be enacted. The chairman of the Board explained clearly that the policy was to allow federal associations to branch unless the state had expressed an hostility to branching so strong that no state financial institution was permitted to do anything comparable to branching.[8] If, instead, some limited form of branching or affiliating was allowed in a particular state, the Board could proceed to authorize whatever type of branching it deemed to be a "best practice" for federal associations. Notwithstanding this clear distinction, no limitation comparable to § 36(c) was adopted by Congress, and the Board has continued to follow the policy expressed in § 556.5(b)(1).

---

8. See e. g. Committee Report No. 518, S. 972, 84th Cong., 1st Sess. (1955) ; and Subcommittee Hearings on S. 2517 and S. 2564, 82nd Cong.2nd Sess. (1952).

■ The Board's decision on January 12, 1973, to authorize *de novo* branching in Illinois was based on its findings that: (1) affiliate, group and chain operations were being conducted in the state on a wide scale; and (2) state associations and banks were multiplying their offices by means of Illinois statutes permitting the establishment of drive-in, relocation and merger facilities.[9] These facilities, the Board concluded, were the functional equivalent of branches, at least as that term is used in § 556.5(b)(1). As far as the Board is concerned, they preclude a finding of the requisite hostility to branching on the part of the state which, under the Board's regulation, would preclude issuing branch charters to federal associations.

Thus, the next question is whether or not the Board's findings are valid. If either of those findings is correct, the Board's authorization of branching in Illinois as a general policy is in compliance with its policy regulation.

V

Before proceeding with a consideration of the validity of the Board's factual determinations, however, we must deal with a challenge raised by certain plaintiffs and *amici curiae* to the constitutionality of this regulation. The plaintiffs in the *Glenview* case contend that the Board's authorization of *de novo* branching powers to federal associations in the face of Illinois law prohibiting similar rights to state associations constitutes a deprivation of property without due process of law. And, *amici curiae*, who have submitted a brief

on behalf of two associations of federal and state banks, argue that to allow federal savings and loan associations to branch while banks are denied the same opportunity, constitutes a violation of the equal protection clause. Both contentions are without merit.

■ Glenview's argument is that the competitive advantage given federal associations by allowing them to branch will result in a deprivation of the property rights of state associations and commercial banks. However, plaintiffs offer nothing to support the asserted constitutional right to be free from this type of competition. Indeed, the only case they cite holds against them. In American Bank & Trust Co. v. Federal Reserve Bank, 262 U.S. 643 at 648, 43 S.Ct. 649 at 651, 67 L.Ed. 1153 (1923), aff'g 284 F. 424 (5th Cir. 1922), the Court stated:

Country banks are not entitled to protection against legitimate competition. Their loss here shown is of the kind to which business concerns are commonly subjected when improved facilities are introduced by others, or a more efficient competitor enters the field. It is a *damnum absque injuria.*

See also Law Motor Freight Co. v. C. A. B., 364 F.2d 139 (1st Cir. 1966), cert. denied, 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed.2d 622 (1967).

Furthermore, even assuming threatened competitive injury, it does not occur without due process of law. Any existing local institution in an area to be served by a newly chartered federal association or branch office has a right to object to the approval of that charter or branch, and the Board is required to

9. Under § 105(15) of the Illinois Banking Act, Ill.Rev.Stat. ch. 16½, banks may establish a drive-in facility within 1500 feet of the bank's main office. The services offered by a drive-in facility may include: receiving deposits, cashing and issuing checks, drafts and money orders, changing money and receiving payments on existing indebtedness.

Under § 709 of the Illinois Savings and Loan Act, Ill.Rev.Stat. ch. 32, savings and loan associations are permitted to retain both offices in the event of a supervisory merger, and may maintain a "facility" in the case of a relocation of the association's business office.

While one of the purposes in enacting § 709 was to enable the Commissioner to allow an association to move from a neighborhood which is no longer able to support the entire institution yet at the same time maintain a facility there to continue to serve that neighborhood's needs, there is no limitation in the statute itself to this type of situation.

find that there will be no undue injury to existing local institutions before any application or charter may be approved. See 12 U.S.C. § 1464(e) and 12 C.F.R. § 545.14(c).

The next constitutional argument, made by both the *Glenview* plaintiffs and *amici curiae*, is that the Board's action in allowing *de novo* branching of federal savings and loan associations results in a denial of equal protection to state associations and state and national banks, since those institutions are not permitted identical branching rights.

Taking first the position of state associations and banks, we find no basis for even examining a contention of an equal protection violation since there is no federal regulatory authority over the branching of either of those institutions. That matter is governed entirely by state law. A contention similar to that urged by plaintiffs here was rejected by the Supreme Court in Abilene National Bank v. Dolley, 228 U.S. 1, 4, 33 S.Ct. 409, 410, 57 L.Ed. 707 (1913). There, a national bank complained of a state statute which provided deposit insurance for state banks. The Supreme Court found no merit in the argument that the resulting competitive advantage accorded state banks was unconstitutionally discriminatory, stating:

> The national banks are free to come into the scheme. The suggestion that they could not come in and remain national banks is simply a statement of the situation of all competitors. They cannot retain the advantages of their adverse situation and share those of the parties with whom they contend. 228 U.S. at 4.

Similarly here, state banks and state savings and loan associations may not complain of a competitive advantage accorded federal savings and loan associations by a separate and distinct regulatory body. State associations are free either to press their legislature into according them a comparable right, or to become federal associations.

■ The issue is slightly different for national banks since both federal associations and national banks are regulated by the federal government. *Amici* argue that "to the extent . . . that national regulation treats similar institutions differently, it can only be supported if there is a rational justification for the difference." (Brief, p. 6). They go on to contend that, whatever basis there may be for treating national banks differently from federal associations, none is relevant to the branching issue. However, we find there is a rational basis for distinguishing the two types of institutions.

Admittedly, savings and loan associations have developed to a point in many ways comparable to, and therefore competitive with, commercial banks. But there remain substantial differences. First, they are under the jurisdiction of different regulatory and examining authorities and are subject to different statutory and regulatory provisions governing their operations and business functions. Second, they perform many different services. Commercial banks may offer checking accounts, trust services, commercial and consumer loans and unsecured personal loans, all of which are generally prohibited to savings and loan associations.

More significant here, however, savings and loan associations remain the most important source of home mortgage financing in the United States.[10] This was one of the primary purposes for which Congress enacted the HOLA —"In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes. . . ." 12 U.S.C. § 1464(a). If Congress felt the Board should be free to decide whether or not providing service through branch offices was a more effective way of fulfilling that purpose,

10. See Journal of the Federal Home Loan Bank Board, Tables S. 5.3 and S. 5.5, October 1973.

we are unable to conclude that the resulting difference in treatment is a "classification utterly lacking in rational justification." Flemming v. Nestor, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L. Ed.2d 1435 (1960).

## VI

We now consider the issue of the validity of the Board's findings that the requisite conditions specified in Reg. § 556.5(b)(1) existed in Illinois when it authorized federal associations to apply for branch offices in January of 1973. The plaintiffs in only two of the eight cases challenge this point. One of them, *Lyons*, limits its argument to a reiteration of its erroneous position that § 556.5(b)(1) is identical to § 36(c) of the National Bank Act, i. e., that it requires exact parity between federal and state associations. This point has already been disposed of in Section IV, *supra*, and deserves no further comment. *Glenview*, the other plaintiff, also continues to misconstrue the regulation, but asserts in addition that: (1) the Board should have held a hearing prior to its January 13 resolution; (2) there is no factual basis for the Board's finding that chain, group and affiliate operations are being conducted in Illinois; and (3) there is no legal basis for the Board's finding that drive-in, merger and relocation facilities are sufficiently equivalent to "branches" as to satisfy the requirements of the regulation.

Defendants respond by stating that (1) no hearing is required prior to this type of factual determination by the Board; (2) plaintiffs have waived their rights to contest these factual findings; and (3) in any event, its findings were factually and legally correct.

It is undisputed that no hearing took place prior to the Board's decision to allow federal associations in Illinois to file branch applications. The determination that the requirements of § 556.5(b)(1) had been met was made by the Board based on information its staff had gathered without any opportunity for outsiders to participate formally. The Board

contends that it is under no requirement to give notice of its proposed findings or to hold any hearing in this situation.

■ As is discussed more fully in Section VII, *infra*, dealing with the validity of the Board's procedures regarding applications for branch offices, neither the HOLA, the APA nor constitutional requirements of due process require the Board to hold a hearing prior to making this factual determination. Rather, such questions are committed in the first instance to agency discretion, subject to judicial review on the standard of whether or not the decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706.

Cases involving analogous situations are instructive. Under § 36(c) of the National Bank Act, which subjects branches of national banks to the location limitations imposed by state law on state banks, the Comptroller is required to interpret state laws on branching in order to decide whether or not an application for a branch from a national bank is in accordance with that law. In making such a determination, the Third Circuit has held:

> Congress committed to the Comptroller the initial responsibility of determining whether the several conditions under which a national banking association may establish a branch are met. One of those conditions is that the proposed branch be within a "village" or "city." The finding of the Comptroller that the area in question is a "village" is essentially a finding of·fact. . . . It is well settled that the decisions of executive officers on questions of fact are conclusive if reasonably supported by substantial evidence. Community National Bank of Pontiac v. Saxon, 310 F.2d 224, 226 (1962).

Finding that the scope of review of a district court was limited by the APA, the Court affirmed the lower court's decision that the Comptroller's decision was not "arbitrary and capricious"— even though the district court had also

found, as an alternative holding, that the area in question was *not* a "village." See also: Warren Bank v. Camp, 396 F. 2d 52 (6th Cir. 1968); and Security Bank v. Saxon, 298 F.Supp. 99 (E.D. Mich.1968).

Similarly, here, the HOLA commits to the Board the initial responsibility of determining whether the conditions under which federal savings and loan associations may branch are met. While the conditions under which a federal savings and loan association may branch are markedly different from those under which a national bank may branch, the responsibility imposed on the regulatory agency to make the initial factual determinations is the same. Consequently, while we have some reservations about the wisdom of allowing an administrative body to make so important a factual determination as is involved in these cases without any opportunity for affected parties to be heard before that determination is made, we can find no legal basis for imposing a hearing requirement on the Board.

The next question is whether plaintiffs here have waived their right to challenge the Board's determinations even in the instant review proceedings. Defendants contend they have by virtue of failing to present their objections to the Board's findings during the branch application proceedings of LaGrange Federal, Brookfield Federal and Talman. We agree.

██ It is a fundamental principle that arguments or objections not raised during administrative proceedings will not be heard for the first time upon judicial review. Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946); D. C. Transit System, Inc. v. Washington Metropolitan Area Transit Com'n., 151 U.S.App.D.C. 223, 466 F.2d 394, 413–414 (1972), cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673; Lloyd A. Fry Roofing v. F. T. C., 371 F.2d 277, 286 (7th Cir. 1966). The Board states that in all of the material

submitted in a protest to the eight branching applications challenged in the instant cases, no protestant: (1) objected to the procedures used by the Board to determine whether the requirements of the regulation were satisfied in Illinois; (2) questioned the fact that there was chain, group or affiliate operations in Illinois; or (3) submitted any legal authority to show that drive-in, supervisory merger and relocation facilities did not constitute the equivalent of branch offices in the sense intended by the regulation.

While we have not examined the full records in all eight cases, plaintiffs themselves admit that the only protests they made on this point were as follows. Lyons states that it "made the argument that the Board's approval of branch applications for Federal Associations in Illinois violated the Board's statement of policy." (*Lyons* Supp.Brief, p. 12) But, as their brief itself reveals, the argument they made went only to the interpretation of the regulation itself. They insisted that § 556.5(b)(1) was identical to § 36(c) of the National Bank Act.

The *Glenview* plaintiffs did nothing but respond to a portion of Talman's written submission regarding the existence of chain, group and affiliate operations in Illinois by stating:

Talman's application cites *one* illegal state savings and loan holding company situation, quotes from an article on banking written in 1930, and refers to two Illinois banking situations which have not been tested for legality; an argument falling far short of proving the alleged 'de facto' branching statement. (Exh. 9, Board's Supp.Memorandum)

Nowhere did this plaintiff deny the existence of chain, group or affiliate operations in Illinois, or challenge the Board's legal determination that the provisions in Illinois law allowing drive-ins, merger and relocation facilities were sufficient to satisfy the requirements of the regulation.

Perhaps realizing that the "objections" made during the application proceedings were clearly insufficient to preserve their rights to appeal on this ground, the *Glenview* plaintiffs argue that they did not have adequate notice of the basis of the Board's decision in order to formulate a meaningful objection. They also contend that the time limitations imposed at the oral argument were such that they had no time to do anything other than make a "general" objection. Both of these assertions are without merit.

The Board's decision to permit the filing of branch applications was made January 12, 1973. The same day, a letter was sent to each member of the Illinois Congressional Delegation informing him or her of the Board's decision and setting forth the legal basis and facts on which the Board based its decision. On January 16, 1973, the Federal Home Loan Bank of Chicago mailed a bulletin to all member insured savings and loan associations in Illinois which summarized the Board's January 12 letter to the Congressional delegation and clearly indicated on what the decision was based. It stated, in relevant part:

> Through the use of chain and group banking, drive-in pedestrian facilities and bank holding companies, there now exists in Illinois affiliate banking and a multiplication of bank offices. Through the use of main office relocations without limitation to declining neighborhoods, supervisory mergers under less stringent conditions, and savings and loan holding companies, there is also now a multiplication of offices by state-chartered savings and loan associations in Illinois.
> \* \* \* \*
>
> The Board now needs to apply to Federal associations in Illinois its general policy with respect to branching set forth in Section 556.5 of the Rules and Regulations for the Federal Savings and Loan System. \* \* \* \*

Furthermore, the Bulletin stated "We recognize this will stimulate many questions" and invited any inquiries to be directed to the Vice President of the Federal Home Loan Bank of Chicago. Considering this bulletin alone, Glenview's statement that it did not have sufficient notice of the basis of the Board's decision is absurd.

Nor can the time limitation imposed at the oral argument be used to justify plaintiff's failure to make an objection. Regardless of how little time there was at oral argument—indeed even if there had been no oral argument—there was no limitation whatsoever on the amount of written material that could be submitted on behalf of a protestant. Besides, plaintiff should have made the objection in the written submission, since oral argument in these proceedings is generally restricted to the material already submitted. [12 C.F.R. § 556.-5(a)(3)]

We conclude then that the plaintiffs in the *Lyons* and *Glenview* suits have waived their right to object to the Board's finding that the requisite conditions in Illinois existed which allowed it to authorize branching of federal associations.

Even if that objection had not been waived, however, we are at a loss to find how the Board's legal conclusion could be deemed arbitrary and capricious.[11] As previously mentioned, the Congressional hearings on the various proposals to amend the HOLA reveal that the Board made clear to Congress exactly what it meant by its branching policy: the Board would not authorize branching of federal associations in any state where the hostility to branching was so strong that *no* type of financial institution was allowed to branch, or do anything similar to branching. (See footnote 8, *supra*.) Furthermore, Congress was informed as early as 1955 that "The only states that would fail to qualify under this test are Montana, New Hamp-

---

11. We do not even conjecture as to the validity of the Board's finding of the existence *of* chain, group and affiliate operations in Illinois.

**24**

shire, West Virginia and Wyoming." Senate Committee on Banking and Currency, Report 518, S. 972, p. 3, 84th Cong. 1st Sess. (1955).

 In light of this interpretation of the Board's regulation, acquiesced in by Congress, it would be very difficult to overturn the Board's decision that the Illinois statutes which permit drive-in/pedestrian, merger and relocation facilities do not evidence the requisite hostility to "branching" that is required by the regulation. It certainly cannot be characterized as arbitrary and capricious.

### VII

The next challenges go to the validity of the procedures followed by the Board in processing applications for branch offices. Plaintiffs contend they do not comport with either the requirements of the Administrative Procedure Act, 5 U.S.C. § 501 et seq. (APA), or with fundamental notions of due process of law. However, prior decisions have unanimously held that the APA is inapplicable to the Board's proceedings on branch applications, and that the requirements of due process are satisfied by much less than was afforded plaintiffs here.

The Board's procedures governing branch applications are set out in 12 C.F.R. §§ 545.14 and 556.5. They may be summarized briefly. The applicant submits an application, giving information as to the necessity, reasonable probability of usefulness and success of the proposed branch. The application must also include information showing that the branch may be established without undue injury to local institutions in the proposed service area. § 545.14(c). Once the application is deemed complete, the applicant must give notice of its filing in a newspaper of local circulation. Within ten days after publication of the notice (which may be extended to 30 days upon request), any person may file written material either in support of or in opposition to the application An applicant is given an additional 15 days to submit information backing up its position. § 545.14(g)(3).

Within ten days after the expiration of the time for submitting written material, any protestant may request an oral argument on the merits of the application. The Board's Supervisory Agent must then give at least 10 days notice of the time and place of the argument to all persons who have submitted any filing regarding the application. § 545.-14(h).

At the oral argument, which is conducted by the Supervisory Agent, or any other person designated by the Board, parties may be represented by counsel, and each side has a minimum of one hour to present their arguments. Arguments "should be based" on the written information already submitted, but the Supervisory Agent can admit new material if he finds it constitutes "substantive new matter." A transcript of the proceedings is made and included in the application file. § 556.5(a)(3). Recommendations are made by the Supervisory Agent and the Office of Industry Development to the Board which then approves or disapproves the application. § 556.5(a)(4).

 Plaintiffs contend these procedures are deficient in that (1) they were denied the opportunity to call witnesses and cross-examine representatives of the applicant at the oral argument; (2) they were denied the right to present new evidence at the oral argument; (3) they were unable to obtain copies of the recommendations, summary and analysis of both the Supervisory Agent and the Office of Industry Development; and (4) the Board did not make findings of fact, conclusions of law and an administrative record upon which a reviewing court could determine whether or not the Board's action was arbitrary and capricious.

Defendants' response to these contentions is that neither the HOLA nor the APA nor constitutional due process considerations require the Board to hold hearings of any type before passing

upon branch applications. By implication, any hearing granted is gratuitous, and unless plaintiffs complain of the Board's failure to follow whatever procedures it has established, there can be no cause of action against it on procedural grounds.

Without exception, cases have upheld defendants' position in this regard. They have found that the Board's determinations on branch applications are issues committed in the first instance to *agency discretion, subject only to judicial review on the arbitrary and capricious standard.* See *e. g*, Bridgeport Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, 307 F.2d 580 (3d Cir. 1962), cert. denied, 371 U.S. 950, 83 S.Ct. 504, 9 L.Ed.2d 499 (1963); First National Bank of McKeesport v. First Federal Savings and Loan Ass'n of Homestead, 96 U.S.App.D.C. 194, 225 F.2d 33 (1955).

Taking the issues specifically, there is certainly nothing in the HOLA itself that imposes any procedural requirements on the Board in its processing of branch applications. Indeed, the statute authorizes the Board to set up its own rules and regulations with no other specific directions. § 1464(a). Cf. Shields v. Utah Idaho R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111 (1938) (construing 45 U.S.C. § 151, First).

The hearing provisions of the APA are applicable only when the statute providing for agency action prescribes " 'hearings on the record;' either in those exact words or in similar phrases. . . . " Duquesne Light Co. v. Environmental Protection Agency, 481 F.2d 1, 6 (3rd Cir. 1973). See also United States v. Allegheny-Ludlum Steel Corp., 406 U S. 742, 747, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972). As we have seen, the HOLA does not so prescribe, and courts have therefore found the APA's hearing provisions inapplicable. See *Bridgeport*

*Federal, supra,* 307 F.2d at 582; *McKeesport, supra,* 225 F.2d at 36 and *Central Savings, supra,* 293 F.Supp. at 623.

Furthermore, the Supreme Court has found that the APA does not require the Comptroller of the Currency to hold hearings when passing on applications for new banking authorities. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The roles of the Comptroller and the Board in passing on applications from banks and savings and loan associations are sufficiently analogous to accept that case as controlling here. Consequently, plaintiffs' claims to the rights to call and cross-examine witnesses, and to introduce new evidence at the oral argument, are wholly unfounded.

Nor is the Board required to make findings of fact and conclusions of law in its decisions to approve or disapprove branch applications. This was the rule even prior to the Supreme Court's decision in Camp v. Pitts. See e. g., Guaranty Savings & Loan Ass'n v. Federal Home Loan Bank Board, 330 F.Supp. at 473; West Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board, No. 413–72, D.C.Dist. of Col., March 30, 1972. And, in Camp v. Pitts, the Court characterized decisions on bank charter applications as "informal action" which did not require formal findings or an opinion explaining the basis for the decision. 411 U.S. at 140. No matter how "curt" the explanation given by the agency, the validity of its action must stand or fall on whether the decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A). If the action is not sustainable on the basis of the administrative record which has been made, the matter must be remanded to the agency for further consideration 411 U.S. at 143.[12] Plaintiffs point to no

12. The Board also points out that because of the extensive protests to the Talman branch application (the *Glenview Guaranty* and *Skokie Federal* cases) it voluntarily issued a comprehensive opinion explaining the reasons for the approval of the application. It contends this opinion goes extensively beyond the "curt explanation" standard of Camp v. Pitts.

authority whatsoever to support their position that any of the procedural failings complained of are violative of any statute or the constitution. Consequently, all portions of the complaints which challenge the validity of the procedures must be dismissed.[13]

## VIII

In summary, we hold that: (1) the Board has authority to approve branch applications for federal savings and loan associations; (2) its authority to allow *de novo* branching of federal associations is not limited by state law except as provided in 12 C.F.R. § 556.5(b)(1); (3) the Board's decision to authorize *de novo* branching in Illinois was in compliance with that regulation; (4) allowing greater branching powers to federal savings and loan associations than is allowed to state savings and loan associations and state and national banks is not a violation of either the due process or equal protection clauses of the United States Constitution; and (5) the procedures followed by the Board in processing branch applications are not invalid. Consequently, since there are no contested issues of material fact and defendants are entitled to judgment as a matter of law on these points, all aspects of the complaints raising these issues will be dismissed.

All of the cases which were filed after *Lyons* were assigned or transferred to us for determination of those issues common to all or a number of them. Our rulings herein do that. There remains in each of the eight cases the question of whether the Board's decision to approve the particular branch application was arbitrary and capricious. The determination of that question will require an examination of the record in each individual case. Accordingly, except for the *Lyons* case, each case should now either be returned to the judge to whom it was originally assigned or be reassigned pursuant to the rules of the court. Appropriate orders will be entered in each of the eight cases.

13. *Skokie Federal's* additional allegation that it was not given adequate notice of the oral argument on the Talman application raises a factual dispute which cannot be resolved on a preliminary motion.