[No. B058411. Second Dist., Div. Three. Jan. 26, 1993.]

THE PEOPLE EX REL. JOSEFINA SEPULVEDA et al., Plaintiffs and Appellants, v.
HIGHLAND FEDERAL SAVINGS AND LOAN et al., Defendants and Respondents.

1694

1696

**COUNSEL**

James K. Hahn, City Attorney, Stephanie Sautner and Ronald Low, Deputy City Attorneys, Litt, Marquez & Fajardo, Barrett S. Litt and Ben Margolis for Plaintiffs and Appellants.

McKenna & Fitting, Michael D. Berk, Aaron M. Peck, Theresa A. Kristovich and Carl W. Sonne for Defendants and Respondents.

**OPINION**

**CROSKEY, J.**—Plaintiffs appeal from the judgment of dismissal following the sustaining without leave to amend demurrers to the second amended complaint of defendants Highland Federal Bank (Highland), Ben Karmelich (Karmelich), Selina Elizabeth Pratt (Pratt), and H.F.S. Corporation (HFS; collectively, the Highland defendants). The court found the complaint failed to state a cause of action for Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) violations, fraud or fraudulent

concealment. The court further found the entire complaint, except the RICO cause of action, was barred by federal preemption.

Because the trial court erred in finding no cause of action was stated and the doctrine of federal preemption barred the state claims, we reverse the judgment.

## FACTUAL STATEMENT

### 1. *The Parties*

Plaintiffs consist of the People of the State of California (People) and numerous individuals in their individual capacity and as guardians ad litem and on behalf of a class who resided in one or more of the subject slum Los Angeles City buildings (tenant plaintiffs).[1]

The defendants who are parties to this appeal are Highland, Karmelich (its president), Pratt (its loan coordinator and vice-president), and HFS (its wholly owned subsidiary).

---

[1] The original individual plaintiffs are: Josefina Sepulveda; Margarita Espinoza; Margarita Bonilla; Raul Cruz Amaya; Jova Corea; Rosa Estela Nevares; Jose Santos Nevares; Rosa Cordova; Maria B. Mergar; Raudel Flores; Haydee Alcantara; Angel Edgardo Flores; Ana Arellano; Jose Roberto Reyes; Concepcion Reyes; Gloria Escobar; Silvia Escobar; Eddy Sanchez; Trinidad Garcia; Ramon Rojas; Josefina Rivera; Manuel Rivera; Salvador Rivera; Leticia Ruiz; Concepcion Garcia; Roman Campos; Ramon Campos; Daisy Villalobos; Maria Rojas; Gregorio Rojas; Amalia Mendoza; Manuel Gil; Maria De La Luz Almaraz; Guadalupe Barragan; Luz Ines Ruiz; Amalia Delgado; Jorge Florez; and Rafael Valtierra, individually, and on behalf of a class composed of all present tenants or residents of the following buildings, all located in the City of Los Angeles: 4020 South San Pedro Street; 5426 Virginia Avenue; 823 South Bonnie Brae Street; 807 South Fedora Avenue; 504 South Bonnie Brae Street; 533 Ceres Avenue; 1000 Echo Park Avenue; 1616 West 11th Street; 526 South Union Avenue; and 2616 Idell Street, and of all persons who were tenants and/or residents of said buildings at material times; Maria De Jesus Rodriguez, Betty Rodriguez, Guadalupe Ibarra, and Esiquio Rodriguez, minors, by their guardian ad litem Josefina Sepulveda; Javier Espinoza, George Michael Espinoza, Yesenia Raquel Espinoza, and Daniel Alejandro Bonilla, Tricia Bonilla, minors, by their guardian ad litem Margarita Espinoza; Alexander Corea Amaya, a minor, by his guardian ad litem Raul Cruz Amaya; Juan Jose Nevares and Carlos F. Nevares, Minors, by their guardian ad litem Rosa Estela Nevares; Yovani Velasquez, Jose Velasquez, Yessica Mergar, minors, by their guardian ad litem Maria B. Mergar; Indira Alcantara, a minor, by her guardian ad litem Haydee Alcantara; Mayra Arellano; Antonio Arellano; Steve Arellano; Eduardo Arellano and Cindy Arellano, minors, by their guardian ad litem Ana Arellano; Patricia Reyes, minor, by her guardian ad litem Jose Roberto Reyes; Karen Rojas, Maria Garcia, Raul Garcia, minors, by their guardian ad litem.

On February 6, 1991, the court dismissed plaintiffs Silvia Escobar, Eddie Sanchez, Ana Arellano, and Guadalupe Barragan in their individual capacity for failing to comply with a prior discovery order.

Highland, a federally chartered savings and loan institution, specializes in making loans to owners of residential properties, including slum buildings in the greater Los Angeles area. Eight of the eleven slum properties listed in this complaint were financed by defendant Highland. Karmelich is both its president and chief executive officer. Karmelich also served as secretary of the board of directors of defendant Northeast. Pratt is a vice-president and loan coordinator for defendant Highland. Pratt helped Highland facilitate the rapid transfer of record ownership of slum buildings. She was also actively engaged in soliciting and arranging for uncreditworthy borrowers to assume Highland loans on those slum buildings without regard to the borrowers' ability to maintain and repair the buildings. HFS is a California corporation and a wholly owned subsidiary of defendant Highland. ▮▮▮ ▬ ▬ Among its activities is the servicing of loans made by defendant Highland.[2]

### 2. *Nature of Charging Allegations*

In this action plaintiffs seek to hold the Highland defendants responsible for the continuing slum conditions of certain buildings. In addition to monetary damages and penalties the complaint seeks injunctive relief.[3]

---

[2]These facts are alleged in the second amended complaint. All well-pleaded allegations of the complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer. (*Shoemaker* v. *Meyers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720].)

These defendants are sometimes collectively referred to as the "Highland defendants." A number of other defendants were named in plaintiffs' second amended complaint. However, these remaining defendants are not parties to this appeal. They consist of other lenders, which are not savings associations, and individuals, including some who at one time or another were owners of the subject 11 buildings. The action remains pending as to these defendants.

[3]Plaintiffs seek to enjoin the Highland defendants from, inter alia:

"(a) Soliciting, engaging or permitting individuals to act as straw buyers or record owners who, in fact, have no genuine ownership interest in the substandard property;

"(b) Recording or causing to be recorded any document containing the name of any record owner who is not the true owner of the substandard property, the legal obligor on the deed of trust, or the party whose assets were relied upon in creating the encumbrance;

"(c) Accepting, notarizing, causing to be notarized, or recording or causing to be recorded any documents that are a part of any financing arrangement concerning any substandard property, which document has been executed by a person other than the person whose name appears on the document;

"(d) Failing to send a copy of the notice set forth in sub-paragraph (g) below to each unit in the substandard property, in both English and Spanish, upon recordation of a trust deed to the potential borrower secured on the subject property;

"(e) Recording or causing to be recorded a trust deed secured by substandard property without first providing a copy of the trust deed, title report, and written proof of compliance with sub-paragraph (d) above to the following interested agencies: [¶] (i) Office of Thrift Supervision (OTS); [¶] (ii) The Housing Enforcement Division of the Los Angeles City Attorney's office; [¶] (iii) The Legal Aid Foundation of Los Angeles;

The thrust of the complaint charges Highland with engaging in unfair business practices and fraud for the purpose of maximizing its profits. Such goal was achieved by creating a situation where rents, which were collectable only if the units complied with the habitability laws, were generated without the expenditure of sums necessary to ensure such compliance. Thus, the slum nature of the buildings was perpetuated and the tenant plaintiffs were defrauded of their right to a habitable dwelling.

Essentially, Highland allegedly committed such illegal activities through fraudulent loan transactions in order to avoid criminal and civil liability. Highland hid and exercised its control over the subject buildings by setting up record owners who had only token or no investment in the buildings, i.e., either such owners had insufficient asserts or lacked bona fide business qualifications to obtain the loans. In general, title to the buildings was worthless since the amount of the loans exceeded the fair market value of the security. The record owners therefore were "strawmen" who were basically managers of the buildings for Highland's benefit.

It is further alleged that Highland in effect was the true beneficial owner of the buildings because it determined who would be the record owner and when the owner failed to perform, Highland replaced him or her with another whom it could control. Such transfers of record ownership also

---

"(f) Selling or assigning Highland's beneficial interest in any note secured by substandard property without first providing to the purchaser or assignee a copy of the trust deed, the recorded substandard order, and the notice described in sub-paragraph (g) below; and without providing notice of such sale to the agencies listed in sub-paragraph (e) above.

"(g) Failing to give written notice to any potential borrower or anyone seeking to assume a note, previously issued by Highland, on substandard property of which the lender has notice by reason of recorded notice or otherwise concerning the potential legal consequences attached to ownership of said property. Said written notice shall include: [¶] (i) An advisement that the subject property or building has been declared substandard; [¶] (ii) That the borrower or person assuming the note and taking title to the property may be held criminally responsible if he or she fails to correct the substandard conditions; [¶] (iii) That the amount of rent a tenant owes may be subject to reduction by virtue of the uninhabitable conditions; [¶] (iv) That tenants may have a cause of action for damages with respect to the conditions in the building, and for injunctive relief requiring repair of said buildings forthwith; [¶] (v) That potential rent increases may be denied pursuant to the Los Angeles City Rent Stabilization Ordinance if the Substandard Notice is not lifted; [¶] (vi) That if borrower or person assuming the note fails to undertake the necessary repairs within a reasonable time (120 days), the lender will petition the court for the appointment of a receiver to collect the rents and make repairs, pursuant to waste provisions of its deed of trust; [¶] (vii) That under California law a borrower may not be able to claim state tax deductions for the interest payments and depreciation on said property until the Substandard Notice is removed.

"(h) Declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed . . . ."

served to complicate and frustrate civil and criminal prosecution for violation of the habitability law.

It was also alleged that Highland routinely facilitated the title transfer of the buildings without the exercise of the due-on-sale clauses of the loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to ensure necessary repairs were made. Highland charged loan points and interest at a rate higher than those for bona fide loan transactions and utilized the entire or almost entire loan amount from the new record owner to pay off the principal, interest, penalties and arrearages owed by the former record holder. Such loans were often arranged by lender-related defendants controlled by and/or associated with Highland. Highland then allowed or caused the fraudulent documents to be recorded in order to hide their control.

Finally, it was alleged the above pattern of activity by Highland was outside of and inconsistent with the normal and standard practice of lenders.

## PROCEDURAL STATEMENT

This action was filed on March 28, 1989. On June 7, 1990, a second amended complaint asserting numerous causes of action was filed, including those for RICO violations, fraud and fraudulent concealment.[4]

---

[4]That complaint set forth, respectively, these causes of action:

(1) Unfair business practices (Bus. & Prof. Code, § 17200) (first cause of action by the People against all defendants);

(2) Violation of 18 United States Code sections 1961-1968 (RICO) (causes of action 81-161 by all plaintiffs against Highland, Karmelich, Pratt, inter alia, but not HFS). Former causes of action 2 through 80 and 81 in the first amended complaint were not realleged in the second amended complaint. There are no causes of action 2 through 80 in the second amended complaint;

(3) Injunctive relief (causes of action 162-242 by all plaintiffs against all defendants);

(4) Breach of warranty of habitability regarding written contract (causes of action 243-323 by all tenant plaintiffs against all defendants);

(5) Breach of warranty of habitability regarding oral contract (causes of action 324-404 by all tenant plaintiffs against all defendants);

(6) Nuisance (causes of action 405-485 by all tenant plaintiffs against all defendants);

(7) Negligence (causes of action 486-566 by all tenant plaintiffs against all defendants);

(8) Strict liability regarding maintenance of slum premises (causes of action 562-647 by all tenant plaintiffs against all defendants);

(9) Intentional infliction of emotional distress (causes of action 648-728 by all tenant plaintiffs against all defendants);

(10) Violation of Civil Code section 1942.4 (causes of action 729-809 by all tenant plaintiffs against all defendants);

On August 6, 1990, Highland defendants filed demurrers to that complaint. They also filed a companion motion to strike. On or about October 19, 1990, plaintiffs filed joint opposition. On or about November 13, 1990, Highland defendants filed their reply.

On January 25, 1991, the court sustained certain demurrers without leave to amend. The court sustained demurrers without leave to amend as to all causes of action, except the second for RICO violations, on the ground of failure to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)) because of federal preemption. As authority it relied on section 545.2 of title 12 of the Code of Federal Regulations; *Fidelity Federal Savings and Loan* v. *De La Cuesta* (1982) 458 U.S. 141, 162 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014]; and *Wisconsin League of Financial Institutions* v. *Galecki* (W.D.Wis. 1989) 707 F.Supp. 401, 405.

The court further sustained demurrers without leave to amend on the ground of failure to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)) specifically as to the 2d cause of action (RICO), the 11th cause of action for fraud, and the 12th cause of action for fraudulent concealment. The court also sustained uncertainty demurrers to the entirety of the complaint with leave to amend. (Code Civ. Proc., § 430.10, subd. (f).) The motion to strike was placed off calendar.

On March 15, 1991, the court entered the order (judgment) of dismissal based on the sustaining of the demurrers of the Highland defendants without leave to amend.

### ISSUES PRESENTED

This appeal presents three basic issues: (1) Are the state claims against Highland, a federal savings and loan association, preempted by federal law? (2) If so, does federal preemption also bar the action against Karmelich, Highland's president, Pratt, its loan coordinator and a vice-president, and HFS, its wholly owned subsidiary? (3) Does the complaint state a cause of

---

(11) Fraud (causes of action 810 through 890 by all tenant plaintiffs against all defendants);

(12) Fraudulent concealment (Civ. Code, § 1710, subd. (3)) by all tenant plaintiffs against all defendants; and

(13) Violation of Civil Code section 789.3 (interruption of utility services) (causes of action 972-1,052 by all tenant plaintiffs against all defendants).

For the purpose of this appeal the enumerated groups of causes of actions in (2) through (13) above are referred to as causes of action 2 through 13, respectively.

action against the Highland defendants for RICO violations, fraud, or fraudulent concealment?

DISCUSSION

1. *Action Against Highland Not Barred by Federal Preemption Under HOLA[5]* ■

 a. *Principles Applicable to Determination of Preemption*

■ "Preemption issues are resolved through the process of statutory interpretation. [Citation.] We look to the language of the statute and to the intent of Congress." (*Siegel* v. *American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 959 [258 Cal.Rptr. 746].)

"'In determining whether a state statute [or a state cause of action] is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. . . . First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. . . . [¶] As a third alternative, in those areas where Congress has

---

[5]The Highland defendants concede the trial court's ruling based on federal preemption was grounded only on the Federal Home Owners' Loan Act of 1933 (HOLA) (12 U.S.C. § 1461 et seq.) and its concomitant regulations. Nonetheless, they urge us to uphold that ruling on the additional grounds of federal preemption based on the Federal Fair Housing Act of 1986 (12 U.S.C. § 3601 et seq.) and The Community Reinvestment Act (12 U.S.C. § 2903 et seq.). They assert: " 'If right upon any theory of the law applicable to the case, [a ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

We have no quarrel with their recitation of law except to find it inapposite since defendants have failed to establish the applicability of those acts to the issues before this court. We observe the above two acts were briefly mentioned at footnote 30 of their demurrer memorandum, and thus, were technically before the trial court.

On appeal they devote several pages to quotations from the Fair Housing Act in their brief but fail to cogently connect the act's requirements with the matters at issue, which are mentioned in some detail in only footnote 19. Similarly, the Highland defendants quote at length from the Community Reinvestment Act but set forth no cognizable connection between its provisions and the subject issues.

Based on the above we reject their position as unsupported. It is well established that as an appellate court we are not required to consider matters urged in the briefs where no pertinent argument is made in support thereof. (See, e.g., *Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].)

not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Nevertheless, pre-emption is not to be lightly presumed.' (*California Federal S. & L. Assn.* v. *Guerra* (1987) 479 U.S. 272, 280-281 [93 L.Ed.2d 613, 623, 107 S.Ct. 683], citations omitted.) In *R. J. Reynolds Tobacco Co.* v. *Durham County* (1986) 479 U.S. 130, 149 [93 L.Ed.2d 449, 467, 107 S.Ct. 499], the court stated: 'Although the regulations are not themselves controlling on the pre-emption issue, where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field completely. Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive.' (Citations omitted.)" (*Siegel* v. *American Savings & Loan Assn., supra,* 210 Cal.App.3d at pp. 958-959.)

### b. *No Express Preemption Under HOLA Except as to Two Items*

HOLA is the acronym of the federal Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.).[6] " 'The language of HOLA, as well as the history that lies behind its enactment, demonstrate that there is a strong federal interest in the uniform treatment of the federally chartered savings and loans associations. Congress initially enacted HOLA and its regulatory structure in response to a crisis in the nation's private home financing system. [Citation.] This crisis had developed at least in part as a result of the inconsistent and ill-advised practices of the various states. As noted by the Ninth Circuit, "the states had developed a hodgepodge of savings and loan laws and regulations, and Congress hoped that [the Federal Home Loan Bank Board's] rules would set an example for uniform and sound savings and loan regulations."[7] (*Conference of Federal Savings & Loan Ass'ns* v. *Stein,* 604 F.2d 1256, 1258, (9th Cir. 1979), *summarily affd.,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980), *citing* T. Marvell, *The Federal Home Loan Bank Board* at 26 (1969).' (*Eureka Federal Sav. and Loan Ass'n* v. *Kidwell* (N.D.Cal. 1987) 672 F.Supp. 436, 439.)" (*Siegel, supra,* 210 Cal.App.3d at p. 959.)

Part 545 of title 12 of the Code of Federal Regulations (12 C.F.R.) sets forth the regulations covering the operations of a federal association. Section

---

[6]All statutory references are to title 12 of the United States Code unless otherwise specified.

[7]The board was replaced in 1989 with the Office of Thrift Supervision (OTS) and its director. (§§ 1462(1) & (3), 1462a(e).)

545.1 of 12 C.F.R., which specifies the general parameters of the association's authority, provides: "A Federal savings association may exercise all authority granted it by [HOLA] and its charter and bylaws, whether or not implemented specifically by Office regulations, subject to the limitations and interpretations contained in this part."

Section 545.2 of 12 C.F.R. provides: " 'The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association.' " (*Ibid.*)

In their brief the Highland defendants urge the import of the above two regulations is preemption of any state law which would limit or penalize the conduct of a federal association where such conduct is authorized by HOLA and not proscribed by HOLA regulations since such law would thus be in direct conflict with HOLA.[8]

---

[8]In a footnote of their brief the Highland defendants urge "[t]here is even a direct conflict between certain specific HOLA regulations and the state law upon which the subject state law claims are predicated."

Specifically, they refer only to two regulations. The first, 12 C.F.R. section 545.32(d) authorizes an association to make a real estate loan up to 100 percent of the market value of the secured property. They claim a direct conflict exists because plaintiffs seek to proscribe loans where the borrower would have no equity in the property, thus, vesting "control" in Highland. We find no conflict. Defendants have mischaracterized certain language in the complaint. When viewed in context, it is clear plaintiffs were not alleging defendants should be prohibited from making loans up to 100 percent of the market value of the property.

The complaint alleged, "The premises involved were security for indebtedness amounting to approximately 100% or more of their value, and additional loans on the property were not available in any bona fide business transaction." It was further alleged defendants "with full knowledge of the slum character of these buildings, has made or aided in the making of loans for amounts exceeding the value of the slum buildings at high interest rates and 'points', requiring payments to the lending defendant which absorbed all or virtually all of the rental flow from the buildings. . . . Each . . . defendant reaped financial benefits from the slum buildings' continuing slum character." In context, the thrust of these allegations is merely to explain one reason why the slum condition of the property was perpetuated, namely, since no equity was left no additional loans were available to fix up the property.

The Highland defendants lastly claim a direct conflict exists between the state claims and 12 C.F.R. section 545.34, which permits an association to incorporate into a mortgage loan contract " 'a provision . . . whereby the Federal association *may, at its option,* declare immediately due and payable' the secured indebtedness upon an unconsented to transfer of title to the real property." They argue plaintiffs seek to "deprive Highland of the *option* to exercise such provision and, instead, compel it to do so." (Italics in original.) In support, they point to the allegations in the complaint that defendants improperly made frequent transfers of the property "from one uncreditworthy and disreputable borrower to another without exercise

As authority for their claim of preemption the Highland defendants argue "[t]he seminal case on the subject, and a case strikingly parallel in material respects to this case, is *People* v. *Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311."[9] They also rely heavily on *Fidelity Fed. Sav. & Loan Ass'n* v. *De La Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014] and *Wisconsin League of Financial Inst.* v. *Galecki* (W.D.Wis. 1989) 707 F.Supp. 401.[10]

of due-on-sale clauses of loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to determine or insure that payments would be made and that the slum buildings would be maintained in accordance with requirements of the law. By making frequent transfers of ownership of the slum buildings, each such defendant's conduct facilitated the ability of the involved record owner to avoid criminal liability for violations of the law . . . [and] each such defendant further effectively avoided or delayed repair of the slum buildings."

We find no conflict in this regard. By such allegations plaintiffs do not seek to deprive defendants of their option to exercise the due-on-sale clauses. Instead, plaintiffs merely seek to preclude defendants from conducting sham transfers of the property. (But see discussion, *post*, regarding a direct conflict as to item (3)(h) of the prayer for injunctive relief.)

[9]As further support, they cite: *Meyers* v. *Beverly Hills Fed. Sav. & Loan Ass'n* (9th Cir. 1974) 499 F.2d 1145 (prepayment penalties); *Greenwald* v. *First Fed. Sav. & Loan Ass'n of Boston* (D.C. Mass. 1978) 446 F.Supp. 620 (interest payments on escrow accounts); *First Fed. Sav. & Loan Ass'n of Boston* v. *Greenwald* (1st Cir. 1979) 591 F.2d 417 (interest payments on escrow accounts); *City Fed. Sav. & Loan Ass'n* v. *Crowley* (E.D.Wis. 1975) 393 F.Supp. 644 (self-dealing of association officers and directors in violation of board's regulations); *Lyons Sav. & Loan Ass'n* v. *Federal Home Loan Bank Board* (N.D.Ill. 1974) 377 F.Supp. 11 (branching of association); *Kaski* v. *First Fed. Sav. & Loan Ass'n of Madison* (1976) 72 Wis.2d 132 [240 N.W.2d 367] (interest rate escalation clauses in mortgage note); *Central Sav. & Loan Ass'n of Chariton* v. *Federal Home Loan Bank Bd.* (8th Cir. 1970) 422 F.2d 504 (mobile associations); *Murphy* v. *Colonial Fed. Sav. & Loan Ass'n* (2d Cir. 1967) 388 F.2d 609 (list of eligible voters re association director election); *North Arlington Nat'l Bank* v. *Kearny Fed. Sav. & Loan Ass'n* (3d Cir. 1951) 187 F.2d 564, cert. den., 342 U.S. 816 [96 L.Ed. 617, 72 S.Ct. 30] (branches); *Glendale Fed. Sav. & Loan Ass'n* v. *Fox* (C.D.Cal. 1978) 459 F.Supp. 903, 904-912 (due-on-sale clause); *Rettig* v. *Arlington Heights Fed. Sav. & Loan Ass'n* (N.D.Ill. 1975) 405 F.Supp. 819 (authority of association to sell insurance and internal obligations of directors); *Elwert* v. *Pacific First Fed. Sav. & Loan Ass'n* (D.Or. 1956) 138 F.Supp. 395 (branches); *Washington Fed. Sav. & Loan Ass'n* v. *Balaban* (Fla. 1973) 281 So.2d 15 (branches); *Springfield Inst.* v. *Worcester Fed. Sav. & Loan Ass'n* (1952) 329 Mass. 184 [107 N.E.2d 315], cert. den. 344 U.S. 884 [97 L.Ed.684, 73 S.Ct. 184] (branches).

Such reliance is patently misplaced. Those cases involved either a direct conflict between state law and specific regulations under HOLA or issues concerning the internal management and direct operation of the federal association itself, and thus, are factually inapposite.

[10]The Highland defendants cite *Federal Sav. & Loan Ins. Corp.* v. *Kidwell* (N.D.Cal. 1989) 716 F.Supp. 1315, for the proposition that state law claims for negligence and waste against the federal association were preempted by federal law. Their reliance on that case is unfounded. In addition to the preemption issue the district court also ruled the claim for breach of fiduciary duty under federal common law was governed by a four-year state statute of limitations. In an unpublished decision the appellate court vacated the lower court decision in part without specifying which part was being vacated. (*Eureka Federal Sav. & Loan Ass'n* v. *Kidwell* (9th Cir. 1991) 937 F.2d 612.) Accordingly, the district court decision is without persuasive or precedential value.

Contrary to their assertion otherwise, *People* v. *Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311 is not "a case strikingly parallel in material respects to this case." In *Coast* "[t]he gravamen of the complaint is that through signs and other means of advertising, defendant [federal association] has transacted business in the manner of a bank and has held itself out as a bank or savings bank, and has led the public to believe that it was such a bank, without authority and in violation of state statutes." (*People* v. *Coast Fed. Sav. & Loan Ass'n, supra*, 98 F.Supp at p. 315.) Former section 161.7(e) of title 24 of the Code of Federal Regulations expressly governed the subject of advertising vis-á-vis federal associations. (98 F.Supp. at p. 315, fn. 5.) In view of such regulation the court held the board had primary jurisdiction over the subject matter. (*Id.* at p. 317.)

In contrast, this case does not involve a direct conflict between a specific regulation and state law. Reliance by the Highland defendants on *Fidelity Fed. Sav. & Loan Ass'n* v. *De La Cuesta* and *Wisconsin League of Financial Inst.* v. *Galecki* is misplaced for that same reason.

In *De La Cuesta* the United States Supreme Court held the board's regulation of due-on-sale clauses preempted state law as embodied in *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943 [582 P.2d 970]. (*Fidelity Fed. Sav. & Loan Ass'n* v. *De La Cuesta, supra*, 458 U.S. 141, 159 [73 L.Ed.2d 664, 678-679].) The *De La Cuesta* court reasoned:

"[T]he Board's intent to pre-empt the *Wellenkamp* doctrine is unambiguous. The due-on-sale regulation plainly provides that a federal savings and loan 'continues to have the power' to include a due-on-sale clause in a loan instrument and to enforce that clause 'at its option.' 12 CFR § 545.8-3(f) (1982). The California courts, in contrast, have limited a federal association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security. [¶] The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. . . . In addition, *Wellenkamp* explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate toward current market rates—a due-on-sale practice the Board has approved . . . ." (458 U.S. at pp. 155-156 [73 L.Ed.2d 676-677], italics in original.)

In *Wisconsin League of Financial Inst.* v. *Galecki, supra*, the court held the "Board has expressly preempted state regulation in the area of mortgage escrow accounts and loan disclosures." (707 F.Supp. at p. 405.) The court

expressly limited its holding the facts of that case by announcing: "The court need not determine the full breadth of the term 'operations of a federal Association' [as provided in section 545.2] because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures. *Fidelity Federal*, 458 U.S. at 167 . . . *Kaski* v. *First Federal Savings & Loan Association*, 72 Wis.2d 132, 240 N.W.2d 367 (1976)."[11] (707 F.Supp. at p. 405.)

It is undisputed that this case involves neither the regulation by state law of advertising, enforceability of due-on-sale clauses, or mortgage escrow accounts and mortgage loan disclosures. Accordingly, the *Coast, De La Cuesta*, and *Galecki* cases are of no moment with regard to whether the subject state causes of action are expressly preempted by HOLA and its concomitant regulations.

 "Preemption of state law by federal regulation is not favored. We will not find express preemption unless a regulation clearly so states. (*Chicago & N. W. Tr. Co.* v. *Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 265, 101 S.Ct. 1124].) It is the burden of the party claiming preemption to prove it. (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630]; *Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].)" (*Siegel* v. *American Savings & Loan Assn., supra*, 210 Cal.App.3d at p. 960.)

 As pointed out in *Siegel*, "[t]he Board is capable of saying it means to expressly preempt all state law in an area. . . . Section 545.2 [of 12 C.F.R.] contains no such statement that federal law is preemptive of all state common law claims." (210 Cal.App.3d at pp. 960-961.)

Similarly, we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc. We therefore hold the subject action is not explicitly barred by federal preemption pursuant to HOLA.[12]

Nonetheless, we do find federal preemption with regard to two matters. First, the allegation that Highland charged loan "points and provided for

---

[11] In addition to direct preemption the *Galecki* court also found implicit preemption based on the finding state regulation of escrow accounts would be "a direct obstacle" to "the Board's express purpose to permit the parties to negotiate terms of an escrow agreement between themselves without intervention by substantive law." (*Wisconsin League of Financial Institutions* v. *Galecki, supra*, 707 F.Supp. at p. 406.) In contrast, the state claims at issue here do not present "a direct obstacle" to any announced OTS policy.

[12] At oral argument the Highland defendants conceded no express statutory preemption exists here.

interest, each of which was higher than the rates for bona fide loan[ ] transactions" impinges on the specific intent of Congress to preempt state usury laws,[13] and thus, improperly delves into an area expressly preempted by HOLA. (See, e.g., § 1463(g).)

The second matter concerns item (3)(h) of the complaint's prayer which seeks to enjoin the Highland defendants from "[d]eclining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed." This requested relief is in direct conflict with 12 C.F.R. section 545.34 which permits a federal association "at its option [to] declare immediately due and payable" the secured indebtedness upon an unconsented to transfer of title to the real property.

On remand, the court is therefore directed to strike such allegations and prayer requests. (Code Civ. Proc., § 436.)

### c. *No Implied Preemption Under HOLA*

Alternatively, the Highland defendants assert the subject action is barred by the doctrine of implied preemption. They urge federal law has impliedly "occupied the field" of federal savings and loan associations with regard to their operations and functions.

We acknowledge HOLA and the regulations promulgated thereunder have created both a comprehensive and uniform thrift system which is federally regulated and that in exercising its broad authority the former board has issued specific, detailed regulations governing those associations. Nonetheless, we observe the United States Supreme Court has declined to conclude

---

[13]Section 1463(g) as to preemption of state usury laws, provides:

"(1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.

"(2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of such payment, an amount equal to twice the amount of the interest paid from the savings association taking or receiving such interest."

the board has preempted all lending practices or that the Board's discretion is limitless.

In *De La Cuesta* the court construed the board's powers to be plenary over federal associations: "The broad language of § 5(a) [of HOLA] expresses no limits on the Board's authority to regulate the lending practices of federal savings and loans. . . . [Thus,] '[i]t would have been difficult for Congress to give the Bank Board a broader mandate.' [Citation.]" (*Fidelity Federal Savings and Loan* v. *De La Cuesta, supra,* 458 U.S. at p. 161 [73 L.Ed.2d at p. 680].)

However, the court expressly declined to find the board had preempted state law as to all lending practices and cautioned: "Because we find an actual conflict between federal and state law, we need not decide whether the HOLA or the Board's regulations occupy the field of due-on-sale law or the entire field of federal savings and loan regulation." (*De La Cuesta, supra,* 458 U.S. at p. 159, fn. 14 [73 L.Ed.2d at p. 679].) The court went on to qualify its holding in that case as follows: "Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion."[14] (*Id.* at p. 167 [73 L.Ed.2d at p. 684].)

▆▆▆ Moreover, "[c]omprehensiveness of federal regulation alone, is not sufficient to establish implied preemption. Again, the United States Supreme Court has said: 'We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a

---

[14]Justice O'Connor wrote separately "to emphasize that the authority of the . . . Board to pre-empt state laws is not limitless. . . . Nothing in the language of § 5(a) of HOLA, which empowers the Board to 'provide for the organization, incorporation, examination, operation, and regulation' of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices." (*Id.* at pp. 171-172 [73 L.Ed.2d at pp. 686-687].)

In his dissent, joined by Justice Stevens, Justice Rehnquist reasoned: "In § 545.8-3(f), the Board has gone beyond regulating how, when, and in what manner a federal savings and loan may lend mortgage money. . . . In this case, the Board is not regulating the operation of federal savings and loan associations, but the operation of due-on-sale clauses. Without a congressional authorization more explicit than that relied upon by the Court, I conclude that the Board has entered a domain in which it is not authorized to override state laws. . . . Discharge of its mission to ensure the soundness of federal savings and loans does not authorize the . . . Board to intrude into the domain of state property and contract law that Congress has left to the States." (*Id.* at pp. 174-175 [73 L.Ed.2d at pp. 688-689].)

field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.' (*Hillsborough County* v. *Automated Medical Labs.* (1985) 471 U.S. 707, 717 [85 L.Ed.2d 714, 724, 105 S.Ct. 2371].) Our task is to determine whether the field which has been preempted by federal regulation is broad enough to cover plaintiffs' state causes of action." (*Siegel, supra,* 210 Cal.App.3d 953, 961-962.)

We conclude it does not. The cause of action for unfair business practices as alleged by the People does not directly affect the operations of Highland, and therefore, is not covered by the subject regulations. Similarly, the regulations promulgated under HOLA do not pertain to racketeering charges under a RICO action. The remaining causes of action, e.g., nuisance, breach of warranty of habitability, intentional infliction of emotional distress, fraud, and interruptions of utilities would, at most, only incidentally and remotely touch upon the operations of Highland in its capacity as a federal savings association. Thus, those also do not impinge on the ambit of HOLA.

No implied preemption is found where the impact on the subject is merely indirect. (See, e.g., *English* v. *General Electric Co.* (1990) 496 U.S. 72 [110 L.Ed.2d 65, 110 S.Ct. 2270].) In *English,* the court held the emotional distress claims of a whistle blower were not preempted by the federal government's exclusive authority to regulate the safety of nuclear power because such claims only indirectly affected the issue of nuclear safety. "Instead, for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." (*Id.* at p. 85 [110 L.Ed.2d at pp. 78-79].) The court reasoned: "For example, if an employer were to retaliate against a nuclear whistle-blower by hiring thugs to assault the employee on the job (conduct literally covered by § 210 [of the Energy Reorganization Act of 1972]), respondent's position would imply that the state criminal law prohibiting such conduct is within the pre-empted field. We simply cannot believe that Congress intended that result." (*Id.* at p. 83 [110 L.Ed.2d at p. 77]; see also, *id.* at pp. 75-76 [110 L.Ed.2d at pp. 71-72].)

Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown. Thus, there must be "a showing of implicit pre-emption of the whole field . . . strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." (*Hillsborough County* v. *Automated Medical Labs., supra,* 471 U.S. at p. 716 [85 L.Ed.2d at p. 723]; see also,

*Merrill Lynch, Pierce, Fenner & Smith* v. *Ware* (1973) 414 U.S. 117, 139-140 [38 L.Ed.2d 348, 366-367, 94 S.Ct. 383] [no preemption by the Security Exchange Act of 1934 of action for profit sharing rights of terminated employee since California has strong policy of protecting wage earners].)

Moreover, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress [it does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." (*Hillsborough County* v. *Automated Medical Labs, Inc., supra,* 471 U.S. at p. 717 [85 L.Ed.2d at pp. 723-724].)

 Accordingly, we determine whether the subject state causes of action are impliedly barred by federal preemption by scrutinizing them to see if they directly are "purporting to address the subject of the operations" of Highland, a federal savings association. (See 12 C.F.R. § 545.2.)

The state causes of action at issue are grounded in Highland's wrongful course of conduct which enables slum conditions in the subject buildings to be perpetuated to the detriment of the health, safety and welfare of the People of California and, in particular, the tenant plaintiffs. The essence of those causes of action concerns the right of the state to prohibit, and punish Highland for its part in, the conspiracy to maintain dwellings in an uninhabitable condition.

From our review of HOLA and its concomitant regulations we have found no statutory provision or regulation which even purports to address the subject of minimum housing standards. Also, any impact or intrusion on the "operations" of Highland is minimal and indirect.

Additionally, we conclude neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances. The paramount purpose of HOLA is to ensure the solvency of federal associations. (See, e.g., § 1463(a)(1)-(3), and § 1464(d)(2).) That purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims. This is not the situation where the state seeks to regulate the conduct of all federal associations in California. Rather, the state merely seeks to protect its own interest in public safety and welfare against the wrongful conduct of an entity, inter alia, which just happens to be a federal association.

d. *Action Against Karmelich, Pratt, and HFS Not Barred by Federal Preemption Under HOLA*

Since this action is not preempted under HOLA as to Highland, a fortiori no preemption bars the action against Karmelich, its president and chief

executive officer, or Pratt, its loan coordinator and vice-president. Moreover, the action is also not preempted against HFS, which is Highland's wholly owned subsidiary but not a federal savings association.

2. *Causes of Action Stated Against Highland Defendants for RICO Violations, and Fraud, but Not Fraudulent Concealment*

a. *RICO Action Properly Pleaded as to Mail Fraud*

██ To state a cause of action under RICO (18 U.S.C. § 1961 et seq.) a plaintiff must plead facts to show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." (*Sedima, S.P.R.L.* v. *Imrex Co.* (1985) 473 U.S. 479, 496 [87 L.Ed.2d 346, 358-359, 105 S.Ct. 3275], fn. omitted.) ██ In their demurrer, the Highland defendants attack the above "enterprise" and "racketeering activity" components.

(1) *Existence of RICO Enterprise Pleaded*

The Highland defendants argue plaintiffs have failed to plead the existence and identity of an "enterprise," i.e., a group of defendants associated in fact for a common purpose although not a legal entity. We disagree.

An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4).)

██ The existence of an enterprise is an essential element of a RICO claim. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . . [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." (*United States* v. *Turkette* (1981) 452 U.S. 576, 583 [69 L.Ed.2d 246, 254-255, 101 S.Ct. 2524]; see also, *Shaffer* v. *Williams* (5th Cir. 1986) 794 F.2d 1030, 1032.)

██ The facts setting forth the existence and identity of the requisite enterprise are not alleged at a single location. Instead, such facts, because of the complexity of the scheme involved, are necessarily gleaned from various portions of the subject complaint.

At paragraph 150 of the complaint it was alleged: "The following associations constitute an enterprise within the meaning of RICO generally and 18 U.S.C. § 1961(4) specifically:

"a. The association in fact of defendants Highland, Northeast, and HFS (the Highland Enterprise).

"。 . . . . . . . . . . . . . . . . . . . . . . . . . .

"c. The association in fact of defendants Karmelich, Highland, North-east, HFS, Leyton, Interreal, Interwest, PHC, and Fitzpatrick (the Highland-Leyton-Fitzpatrick Enterprise)."

Although subparagraph a of paragraph 150 refers to Highland, Northeast, and HFS, as "the Highland Enterprises" it is clear such enterprise is but a component of the "enterprise" which comprises this element of a RICO action. Similarly, the reference to "the Highland-Leyton-Fitzpatrick Enterprise" in subparagraph d of paragraph 150 is to the component of the "enterprise" consisting of the members of the Highland Enterprise, defendants Leyton, Interreal, Interwest, PHC and Fitzpatrick. From a review of the factual allegations concerning these components of such "enterprise" it is clear the requisite facts concerning the existence of an informal ongoing organization consisting of a group of entities associated together for a common purpose of engaging in a course of conduct and functioning as a continuing unit have been alleged.

The complaint essentially alleges the above defendants engaged in a continuing scheme to defraud the tenant plaintiffs by secretly manipulating the record owner defendants and by actively assisting such owners to perpetuate the buildings in an uninhabitable condition in violation of the law. That the Highland, HFS and Northeast defendants were ongoing business entities which had an ongoing relationship with each other independent of that fraud scheme is shown by the following facts: It was alleged Highland was a federal savings and loan association specializing in loans on residential property; Northeast, an investment corporation located at Highland's offices, was engaged in the business of handling insurance; and HFS, a wholly owned subsidiary of Highland, serviced loans made by Highland. The complaint further alleged that the association of defendant Highland, Northeast and HFS constituted an association in fact within the meaning of RICO. The above factual allegations thus evidence an interlocking independent business relationship among those three entities.

Moreover, it was also alleged that defendants Interreal, Interwest and PHC, all of which were entities in which defendant Leyton had an interest, along with the above Highland entities and the individual defendants, Karmelich, as the secretary of Northeast's board of directors, Leyton and Fitzpatrick constituted an association of fact, and thus, an enterprise. The specifics of such association are set forth in the complaint and demonstrate an ongoing series of business transactions among these various defendants with regard to each of the subject buildings. (See, e.g., *Temple University* v.

*Salla Bros., Inc.* (E.D.Pa 1986) 656 F.Supp. 97, 102 [sufficient ongoing organization shown]; cf. *Calcasieu Marine Nat. Bank* v. *Grant* (5th Cir. 1991) 943 F.2d 1453, 1461-1463 [no ongoing association shown]; *Martin* v. *Brown* (W.D.Pa. 1990) 758 F.Supp. 313, 322 [insufficient ongoing unit shown]; *Uniroyal Goodrich Tire Co.* v. *Mutual Trading Corp.* (N.D.Ill. 1990) 749 F.Supp. 869, 876-877 [insufficient "association-in-fact" shown].)

(2) *"Racketeering Activity" Based on Mail Fraud Properly Pleaded*

"Racketeering activity" under RICO consists of certain specific acts which are expressly enumerated in title 18 United States Code, section 1961. The activity underlying the subject RICO claim is mail fraud and wire fraud. "In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) [or the wire fraud statute (18 U.S.C. § 1342)] as a predicate act under a RICO scheme, plaintiffs must allege that (1) defendants devised a scheme or artifice to defraud, (2) defendants used the mails [or wires] in furtherance of the scheme, and (3) defendants did so with the specific intent to deceive or defraud. [Citation.]" (*McMartin* v. *Children's Institute International* (1989) 212 Cal.App.3d 1393, 1407 [261 Cal.Rptr. 437]; accord, *Schreiber Distributing* v. *Serv-Well Furniture Co.* (9th Cir. 1986) 806 F.2d 1393, 1399-1400 [mail and wire fraud]; see also, *United States* v. *Gordon* (5th Cir. 1986) 780 F.2d 1165, 1171 [wire fraud].)

The Highland defendants also challenge the allegations of mailing and wire fraud as inadequate. They argue plaintiffs are required to but have failed to "specifically plead the time, place or nature of the alleged communications constituting racketeering activity. [Citation.]" (*McMartin* v. *Children's Institute Int'l, supra*, 212 Cal.App.3d at p. 1407; see also, *Alan Neuman Productions, Inc.* v. *Albright* (9th Cir. 1988) 862 F.2d 1388, 1392; *Rosenthal* v. *Vogt* (1991) 229 Cal.App.3d 69, 77 [280 Cal.Rptr. 1].)

We agree the allegation of "wire fraud" is totally deficient in the above regard. Subparagraph e of paragraph 151 merely alleges: "Interstate telephone conversations relating to the slum buildings with lenders, persons attempting to locate various of the defendants, the Federal Home Loan Bank Board, and others." No facts are alleged to show the nature of such conversations or the place and time thereof. Accordingly, since plaintiffs have failed to show how such defects would be remedied if leave to amend were granted, we conclude the trial court was correct in impliedly finding the predicate act of "wire fraud" was inadequate to support a RICO action. (See, e.g., *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The court is thus directed to strike subparagraph e of paragraph 151. (Code Civ. Proc., § 436.)

We further conclude, however, the court erred in sustaining the demurrer to that cause of action since the plaintiffs have adequately pleaded facts to support the predicate act of "mail fraud." The specific factual allegations of the mailings in the subject complaint are both qualitatively and quantitatively superior to the bare conclusionary allegation found to be inadequate in *Schreiber Distributing Co.* v. *Serv-Well Furniture Co.*, *supra*, 806 F.2d 1393. In *Schreiber*, the sole allegation was "on two or more occasions [defendants used] the United States mail . . . for the purpose of executing or attempting to execute the aforesaid fraudulent scheme . . . ." (*Id.* at p. 1401; cf. also, *Alan Neuman Productions, Inc.* v. *Albright*, *supra*, 862 F.2d 1388, 1393, "The allegation of [the] complaint concerning predicate acts of fraud are similarly general referring to 'many acts of mail fraud,' 'many acts of wire fraud,' and 'many victims.' ")

In contrast, the complaint here described the nature of the mailings as consisting "of [the] documents, deeds, deeds of trust and similar matters relating to the slum buildings." They were further delineated as the mailings were described as "[m]ailing of rent checks, mortgage and loan payments, payment for services rendered, and similar commercial transactions relating to slum buildings." The mailings of various materials were also described as relating to code violations regarding slum buildings. Moreover, the place of mailing was reflected in the allegation of "[m]ailing of materials to various governmental entities, and recordation of real estate documents requested by mail and directed to the Los Angeles County Recorder. Every recorded document pertaining to the real estate transactions described in this complaint was sent through the mails to the County Recorder in furtherance of their conspiracy."

The intent to defraud element was supplied through the allegations concerning their effort to achieve the fraudulent objectives. Additional facts as to the time, place, and content of the fraud are set forth with particularity at paragraphs 87 through 98 of the complaint.

The allegations of the subject complaint as to time, place, etc., sufficiently comport with the requirement of pleading fraud with particularity. As one court explained: "Plaintiffs cannot be expected to specify the exact time and particular place of each factual omission and misrepresentation. The complaint adequately specifies the transactions and the approximate time frame, the contents of the alleged misrepresentations and the essence of omitted information, and the identities of those involved." (*Onesti* v. *Thomson McKinnon Securities, Inc.* (D.C.Ill. 1985) 619 F.Supp. 1262, 1265.)

As to other specific dates and details, we point out such matters are properly addressed during discovery, not on demurrer. Also, when a particular document or matter was mailed is within the peculiar knowledge of the

defendants. (See, e.g., *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 214, 217 [197 Cal.Rptr. 783, 673 P.2d 660].)

### (3) *Nexus Between Racketeering Activity and Injury Pleaded*

The Highland defendants next attack plaintiffs' RICO claim on the ground no facts are alleged to show any direct injury to the tenant plaintiffs as the proximate result of the racketeering activity. (*Sedima, S.P.R.L.* v. *Imrex Co., supra,* 473 U.S. at p. 496 [87 L.Ed.2d at pp. 358-359]; *McMartin* v. *Children's Institute, supra,* 212 Cal.App.3d at p. 1407.)

We reject their contention as meritless. The injury suffered by each tenant plaintiff was the deprivation of a habitable dwelling and the loss of the money he or she had paid in rent, which was excessive because the dwellings were uninhabitable. Such injury flowed directly from the racketeering activity committed by defendants.

### (4) *Violation of 18 United States Code Section 1962(d) Pleaded*

In a related argument defendants assert the lack of a legally cognizable injury flowing from the racketeering activity also demonstrates the failure of plaintiffs to allege a violation of title 18 of the United States Code, section 1962(d).[15] (See *Medallion TV Enterprise* v. *SelecTV of California* (C.D.Cal. 1986) 627 F.Supp. 1290, 1297-1301.)

We disagree. As discussed, above, the requisite injury was properly alleged, and thus, defendants' assertion is untenable.

### b. *Cause of Action Stated for Fraud*

The Highland defendants contend no cause of action for fraud is stated because there are insufficient facts alleged to " 'show how, when, where, to whom, and by what means the [mis]representations were tendered.' *Stansfield* v. *Starkey* (1990) 220 Cal.App.3d 59, 73, . . . quoting *Hills Transp. Co.* v. *Southwest Forest Indus., Inc.* (1968) 266 Cal.App.2d 702, 707 . . . ." They complain "the People and the tenants [plaintiffs] allege . . . 'each record owner', without any further identification or limitation, made the allegedly fraudulent representations; that they were made to

---

[15]Subdivision (d) of section 1962 provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

The relevant subdivision is (c), which provides in pertinent part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

'plaintiffs', without any further identification; and that they were made 'at the time of each respective record owner's ownership', without any further limitation as to time. The complaint is silent as to how the alleged representations were communicated." They contend the "above allegations are, of course, calculated to avoid communicating meaningful information about the alleged fraud either to the Highland defendants or to the Court. . . ." (*Ibid.*)

Defendant's contentions are meritless. The complaint sets forth with ample particularity the identities of the record holders, the identities and capacities of the many plaintiffs, and the time frame in which the representations were made. We acknowledge the allegations of fraud lack the specific detailed minutiae desired by the Highland defendants. Those details, however, are properly the subject of discovery, not demurrer. The magnitude of the fraudulent scheme alleged and the number of plaintiffs involved invoke the analogy to the fact situation in *Committee on Children's Television, Inc.* v. *General Foods Corp.*, *supra*, 35 Cal.3d 197, 214.

In that case, the court rejected a lack of specificity argument based on the following reasoning, which we find instructive here: "Plaintiffs allege that defendants carried out a large scale program of deceptive advertising in which the specific advertisements change constantly, but all follow a pattern of making, in one form or another, certain misleading and deceptive representations. If such is the case, to require plaintiffs to plead the specifics of each advertisement would render a suit challenging the overall program impractical. The complaint would have to include thousands of pages setting out specifics which are largely within defendants' knowledge. The cost and difficulty of compiling, organizing, and setting down the information would seriously deter the filing of such complaint. The effect of such a pleading requirement, moreover, would not be limited to discouraging private suits; it would also seriously hamper suits by public officials seeking to enjoin schemes of unfair competition and deceptive advertising." (*Committee on Children's Television, Inc.* v. *General Foods Corp.*, *supra*, 35 Cal.3d 197, 214.)

### c. *No Fraudulent Concealment Cause of Action Stated*

Defendants claim no cause of action is stated for fraudulent concealment for two reasons: (1) the Highland defendants were under no legal duty to disclose the concealed facts at issue; and (2) in any event, the cause of action erroneously assumes someone who lends money on the security of real property may, by virtue of that activity, assume the obligations of ownership. They point out unless the defendant is under a duty to disclose, concealment of a fact is not actionable. (Civ. Code, § 1710, subd. (3).) Defendants argue there is no duty to disclose here because section 1962 of the Civil Code does not require the disclosure of the name and address of the

owner of certain real property. Such a requirement, according to defendants, is based on the assumption "that Section 1962 imposes on an owner of real property a duty to disclose his or her name and address *even when the name and address of an agent for the owner, such as a property manager, is disclosed.* That assumption is fallacious."

They further argue "someone that lends money on the security of, but does not have possession and control of, real property may [not], by virtue of that activity, become the 'beneficial' or 'responsible' owner of such property and thereby assume the obligations of ownership [and thus, the duty to disclose under Civil Code section 1962] to [the] tenants."

We agree no cause of action for fraudulent concealment is stated but not for the reasons given by defendants. The thrust of this cause of action is to compel the beneficial owners to disclose such beneficial ownership to the tenant plaintiffs to enable the latter to seek "civil relief or governmental enforcement of the law from the responsible non-record owner defendants." Plaintiffs concede as much in their reply brief: "If the tenants had known that the one in control of the property was a bank, they would be far more likely to bring an action to have the property repaired than they would were the owner a person having substantially no assets."

A plain reading of section 1962 of the Civil Code[16] reveals its disclosure provisions do not give rise to a duty to disclose the name and address of a beneficial owner. All that is required under section 1962 is the disclosure of "the name and usual street address at which personal service may be effected

---

[16]Civil Code section 1962 provides:

"(a) Any owner of a dwelling structure specified in Section 1961 or a party signing a rental agreement or lease on behalf of the owner shall disclose therein the name and usual street address at which personal service may be effected of each person who is:

"(1) Authorized to manage the premises.

"(2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands.

"(b) In the case of an oral rental agreement the owner or a person acting on behalf of the owner for the receipt of rent or otherwise, on written demand, shall furnish the tenant with a written statement containing the information required by subdivision (a).

"(c) The information required by this section shall be kept current and this section shall extend to and be enforceable against any successor owner or manager, who shall comply with this section within 15 days of succeeding the previous owner or manager.

"(d) A party who enters into a rental agreement on behalf of the owner who fails to comply with this section is deemed an agent of each person who is an owner:

"(1) For the purpose of service of process and receiving and receipting for notices and demands.

"(2) For the purpose of performing the obligations of the owner under law and under the rental agreement.

"(e) Nothing in this section limits or excludes the liability of any undisclosed owner."

of each person who is: (1) Authorized to manage the premises[; and] (2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands." (Civ. Code, § 1962.) The reference to "[a]n owner of the premises" is to the record owner, not the beneficial owner. This is clear from the language of subdivision (e) of Civil Code section 1962, which provides: "Nothing in this section limits or excludes the liability of any undisclosed owner."

DISPOSITION

The judgment is reversed with directions to the court: (1) to strike the allegation that Highland charged "points and provided for interest, each of which was higher than the rates for bona fide loans transactions"; (2) to strike prayer item (3)(h); (3) to strike subparagraph (e) of paragraph 151 of the second amended complaint; and (4) to conduct further proceedings consistent with the views expressed herein. The plaintiffs shall recover their costs on appeal.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied February 25, 1993, and respondents' petition for review by the Supreme Court was denied April 22, 1993.